DAVID T. PROSSER, J.
¶ 139. (concurring). The
court is confronted with three separate but overlap-
*101 ping cases related to a John Doe investigation involving [- -], and a substantial number of organizations and individuals who are associates and political allies of [- -].
¶ 140. This is the second John Doe investigation initiated by the Milwaukee County District Attorney's Office that has focused on [-] and [-] political circle. The present investigation concerns alleged campaign finance violations, but the scope of the investigation is sufficiently broad that it amounts to a fishing expedition into the lives, work, and thoughts of countless citizens.
¶ 141. For all practical purposes, the court has merged the two writ cases[1] into the original action[2] and invited the parties to submit briefs on all issues, even if an issue was not part of the party's original case.
¶ 142. The consolidated case presents at least 14 issues. Collectively they are complex and difficult. They also are important to the people of Wisconsin. Many of these issues are addressed in the majority opinion. I write separately to provide my own analysis and perspective on the following issues:
(1) Issues 4 and 5 related to the appointment of the special prosecutor.
(2) Issue 14 related to several search warrants. However, the record in this matter requires discussion *102 of search warrants and subpoenas beyond the warrants identified in Issue 14.
(3) Issue 6 related to the application of Wis. Stat. § 11.26(13m) to contributions in recalls.
(4) Issues relating to several different provisions in Chapter 11 of the Wisconsin Statutes.
¶ 143. This concurring opinion discusses issues arising out of a John Doe investigation that is subject to multiple broad secrecy orders. Full adherence to these secrecy orders in their original breadth is impossible because full adherence would mean that the court could not acknowledge what the John Doe is about or discuss fully the numerous issues bearing on the scope, conduct, and propriety of the investigation.
¶ 144. "Secrecy of John Doe proceedings and the records thereof is not maintained for its own sake." State v. O'Connor, 77 Wis. 2d 261, 252 N.W.2d 671 (1977). Instead, "[t]he policy underlying secrecy is directed to promoting the effectiveness of the investigation. Therefore, any secrecy order 'should be drawn as narrowly as is reasonably commensurate with its purposes.' " State ex rel. Unnamed Person No. 1 v. State, 2003 WI 30, ¶ 61, 260 Wis. 2d 653, 660 N.W.2d 260 (quoting O'Connor, 77 Wis. 2d at 286). In making determinations about the scope of a secrecy order, "[a] balance must be struck between the public's right to be informed about the workings of its government and the legitimate need to maintain the secrecy of certain John Doe proceedings." Id., ¶ 66.
¶ 145. It is important to protect the targets of a John Doe investigation when it is determined that they have not committed a crime. This protection extends to the identity of individual people as well as the content of their private communications and other *103 records obtained in the course of the investigation. Here, there is no similar interest in protecting the actions of the John Doe judge or the special prosecutor. Because the majority orders the John Doe investigation "closed," it cannot be said that the continued secrecy of certain facts in this matter — the scope and nature of the investigation, search warrants, and subpoenas, for example — is necessary to protect the integrity of this or a future John Doe investigation. Accordingly, I conclude that discussion of these facts is not inconsistent with the secrecy order.
¶ 146. Thus, this concurring opinion does not name individuals or organizations, except the individuals and organizations who initiated and conducted the John Doe investigation. State and local government officials who initiate sweeping criminal investigations of Wisconsin citizens cannot expect to keep their conduct secret indefinitely, and appellate courts reviewing state and local government conduct do not provide the public with the full reasoning for their decisions if they are unwilling or unable to discuss the facts essential to these decisions. See majority op., ¶ 14 n.ll, ¶ 88 n.25.
¶ 147. My interpretation of the secrecy order is essential to the discussion of certain procedural issues and is taken (1) after discussion with the court, (2) with knowledge that much information about the investigation has already been disclosed, and (3) with experience that additional disclosure in the future is likely.
¶ 148. In my view, all issues of law in this matter are subject to de novo review.
¶ 149. I join Section III of the majority opinion, and I concur in the result of Section IV. Although I agree with most of the discussion in Section IV, I would reach the result as a matter of law.
*104 I
¶ 150. Scott Walker was elected governor of Wisconsin on November 2, 2010. He was sworn in as governor on January 3, 2011.
¶ 151. On February 14, 2011, Governor Walker proposed a Budget Repair Bill that was intended to deal with the state's fiscal situation for the remaining months of the 2009-2011 biennium and for the 2011-2013 biennium beginning on July 1, 2011. Legislation to implement the governor's plan was introduced in both the Senate and Assembly. The proposed legislation included provisions requiring additional public employee contributions for health care and pensions. The two bills also included provisions curtailing collective bargaining rights for most state and local public employees and making appropriations.
¶ 152. The history of this legislation — which became 2011 Wis. Act 10 (Act 10) — is discussed in State ex rel. Ozanne v. Fitzgerald, 2011 WI 43, 334 Wis. 2d 70, 798 N.W.2d 436, and Madison Teachers, Inc. v. Walker, 2014 WI 99, 358 Wis. 2d 1, 851 N.W.2d 337. See also Wis. Educ. Ass'n Council v. Walker, 705 F.3d 640 (7th Cir. 2013).
¶ 153. Act 10 was highly controversial. Intense opposition in the legislature included more than 60 consecutive hours of debate in the Assembly and the departure of all 14 Democratic senators from the state for nearly a month to deprive the Senate of a sufficient quorum to pass the original bill. Public opposition to Act 10 included massive demonstrations at the Wisconsin State Capitol. The demonstrations were so large that they garnered national and international attention. There were many smaller demonstrations throughout Wisconsin.
*105 | 154. After its passage, the Act 10 legislation was challenged in the Dane County Circuit Court on procedural grounds to prevent its publication as an act. It was later challenged again in both federal and state courts in an effort to invalidate several of its provisions on constitutional grounds. The main challenge to Act 10 was not resolved by this court until mid-2014. Madison Teachers, 358 Wis. 2d 1.
¶ 155. The introduction and passage of Act 10 also led to efforts (1) to defeat a supreme court justice in April 2011, producing an exceptionally close election and the first statewide candidate recount in Wisconsin history; (2) to recall 16 state senators in July and August 2011, nine of whom were forced to run for reelection; and (3) to recall the governor, lieutenant governor, and five state senators in June 2012. Four of the five senators had to run for reelection.
¶ 156. Two Republican state senators were defeated in 2011 and one Republican state senator was defeated in 2012. The latter election shifted control of the state senate to the Democrats. This was the second time in recent years that a recall election in Wisconsin shifted control of the state senate to the Democratic party.[3]
¶ 157. The John Doe investigation under review is ostensibly about alleged criminal activity by [- -], -], and [-] during the multiple recall elections described above. In an affidavit in support of the petition for the John Doe *106 proceeding in August 2012, an investigator in the Milwaukee County District Attorney's office wrote:
3. The purposes and goals of this John Doe investigation would be to:
a. Determine the nature and extent of an agreement or understanding related to the solicitation by [-], and [- -], [- -] in the 2011 and 2012 recall elections, for contributions to organizations regulated by Title 26 U.S.C. 501(c)4 contrary to Wisconsin Stats sec. 11.10(4), 11.26, 11.27 and 11.61(l)(b);
b. Determine whether the circumstances under which the solicitation and use of said campaign contributions were to circumvent the provisions of Wisconsin Stats sec. 11.26 and 11.27(1) by individuals and others identified above, for a criminal purpose in order to avoid the requirements of Wisconsin Stats. Sec. 11.06(1) and 11.27(1).
¶ 158. In fact, however, the Milwaukee County District Attorney's Office targeted [-] circle for investigation before [- -], and it has framed the present investigation to include alleged campaign finance violations dating from 2009 through the 2012 recall elections.
¶ 159. Almost immediately after the introduction of Governor Walker's Budget Repair Bill, talk of his recall began to surface. However, because Walker was elected in 2010 and did not take office until January 3, 2011, he could not be recalled under the constitution until 2012 "after the first year of the term for which the incumbent was elected." Wis. Const, art. XIII, § 12. Consequently, Walker's opponents focused their attention in the short term on a pending race for the supreme court and the recall of eight Republican *107 state senators elected in 2008: Robert Cowles (District 2); Alberta Darling (District 8); Sheila Harsdorf (District 10); Luther Olsen (District 14); Randy Hopper (District 18); Glenn Grothman (District 20); Mary Lazich (District 28); and Dan Kapanke (District 32). Formal recall efforts for these senators began on March 2, 2011.
¶ 160. Opponents of Governor Walker and the senators who voted for Act 10 succeeded in obtaining the required signatures to force recall elections for Senators Cowles, Darling, Harsdorf, Olsen, Hopper, and Kapanke. They failed to obtain sufficient signatures to force recall elections for Senators Grothman and Lazich.
¶ 161. Supporters of Governor Walker attempted to recall eight Democratic state senators, namely, Lena Taylor (District 4); Spencer Coggs (District 6); James Holperin (District 12); Mark Miller (District 16); Robert Wirch (District 22); Julie Lassa (District 24); Fred Risser (District 26); and Dave Hansen (District 30). Their formal efforts began as early as February 22 (District 12). They succeeded in obtaining the required number of signatures to force recall elections for Senators Holperin, Wirch, and Hansen. They failed to obtain sufficient signatures to force recall elections for Senators Taylor, Coggs, Miller, Lassa, and Risser.
¶ 162. In the 2011 recall elections, Senators Randy Hopper and Dan Kapanke were defeated. Senators Cowles, Darling, Harsdorf, Holperin, Olsen, Wirch, and Hansen were reelected.
¶ 163. Opponents of Governor Walker sought to recall Walker and Lieutenant Governor Rebecca Kleefisch and four Republican state senators, namely, Scott Fitzgerald (District 13); Van Wanggaard (District 21), Terry Moulton (District 23); and Pam Galloway *108 (District 29), in 2012. Supporters of Governor Walker attempted to recall Senator Robert Jauch (District 25). Insufficient signatures were submitted to recall Senator Jauch. However, all the Republican targets faced recall elections in 2012, except Senator Galloway, who resigned on March 16, 2012. She was replaced by Representative Jerry Petrowski, who ran in the recall general election.
¶ 164. The timing of the recall elections in 2011 and 2012 was complicated by multiple different filing dates for recall petitions and a substantial number of primary elections. Recall petitions were filed with the Government Accountability Board (GAB) on April 1, 2011 (Senator Kapanke); April 7, 2011 (Senator Hopper); April 18, 2011 (Senator Olsen); April 19, 2011 (Senator Harsdorf); April 21, 2011 (Senators Darling, Holperin, Wirch, and Hansen); and April 25, 2011 (Senator Cowles).
¶ 165. Primary elections were held on July 12, 2011, in Senate Districts 2, 8, 10, 14, 18, and 32. Primary elections were held on July 19, 2011, in Districts 12 and 22.
¶ 166. In 2011 the recall general elections were held on July 19, 2011 (District 30); August 9, 2011 (Districts 2, 8, 10, 14,18, and 32); and August 16, 2011 (Districts 12 and 22).
¶ 167. In 2012 the primary elections for governor, lieutenant governor, and the four senate seats in Districts 13, 21, 23, and 29 were held on May 8. The recall general elections were held on June 5, 2012. Senator Van Wanggaard was defeated. Governor Walker, Lieutenant Governor Kleefisch, and Senators Fitzgerald and Moulton were reelected. Representative Petrowski was elected as a Republican to succeed Senator Galloway.
*109 ¶ 168. The seemingly insignificant factual details of these multiple elections are important to show the unprecedented, unscheduled electoral activity in Wisconsin during 2011 and 2012, and to relate these multiple elections to Wisconsin campaign finance laws.
II
¶ 169. Wisconsin statutory law on recalls is contained primarily in Wis. Stat. § 9.10. This section is intended "to facilitate the operation of article XIII, section 12, of the [Wisconsin] [Constitution," Wis. Stat. § 9.10(7), which provides for the recall of "any incumbent elective officer after the first year of the term for which the incumbent was elected." Wis. Const, art. XIII, § 12.
¶ 170. "[A] petition for recall of an officer shall be signed by electors equal to at least 25% of the vote cast for the office of governor at the last election within the same district or territory as that of the officeholder being recalled." Wis. Stat. § 9.10(l)(b).
¶ 171. Wisconsin Stat. § 9.10(2) outlines the petition requirements, including the design of recall petition forms. Paragraph (2)(d) provides:
No petition may be offered for filing for the recall of an officer unless the petitioner first files a registration statement under s. 11.05(1) or (2) with the filing officer with whom the petition is filed. The petitioner shall append to the registration a statement indicating his or her intent to circulate a recall petition, the name of the officer for whom recall is sought and, in the case of a petition for the recall of a city, village, town, town sanitary district, or school district officer, a statement of a reason for the recall which is related to the official responsibilities of the official for whom removal is sought. . . . The last date that a petition for the recall *110 of an officer may be offered for filing is 5 p.m. on the 60th day commencing after registration. . .. No signature may be counted unless the date of the signature is within the period provided in this paragraph.
¶ 172. Paragraph (2)(d) is significant in several respects. First, a recall effort cannot formally begin until a registration statement is filed under Wis. Stat. § 11.05(1) or (2). However, the organization of a recall campaign may begin much earlier than the date of registration, and the planners and organizers are not required to report any activity or expenditure to launch the campaign except expenditures by already-registered political committees.
| 173. Second, supporters of a recall campaign have 60 days after registration to circulate and file their recall petitions. However, organizers of the Scott Walker recall petition shrewdly selected Tuesday, November 15, 2011, to register their recall efforts. Under Wis. Stat. § 990.001(4)(a), which deals with how time is computed under the Wisconsin Statutes, the first day is excluded in counting the 60 days. Under Wis. Stat. § 990.001(4)(c), if the deadline for filing a document is on a day when the filing office is closed, the filing "may be done on the next succeeding day that is not a Sunday or a legal holiday." The Walker recall petition was due on January 14, 2012. However, January 14 was a Saturday, which meant that the petition did not have to be filed until Tuesday, January 17, because January 16 was a legal holiday (Martin Luther King's birthday). This gave the organizers 64 days to circulate and file the Walker, Kleefisch, Fitzgerald, Wanggaard, Moulton, and Galloway recall petitions.
¶ 174. Third, Wis. Stat. § 9.10(2)(b) makes plain that no stated reason is required to recall a state officer, as opposed to a local official.
*111 ¶ 175. Wisconsin Stat. § 9.10(3)(b) provides that:
Within 10 days after the petition is offered for filing, the officer against whom the petition is filed may file a written challenge with the official, specifying any alleged insufficiency. If a challenge is filed, the petitioner may file a written rebuttal to the challenge with the official within 5 days after the challenge is filed. If a rebuttal is filed, the officer against whom the petition is filed may file a reply to any new matter raised in the rebuttal within 2 days after the rebuttal is filed. Within 14 days after the expiration of the time allowed for filing a reply to a rebuttal, the official shall file the certificate or an amended certificate.
¶ 176. Subsection (3)(b) continues:
Within 31 days after the petition is offered for filing, the official with whom the petition is offered for filing shall determine by careful examination whether the petition on its face is sufficient and so state in a certificate attached to the petition. If the official finds that the amended petition is sufficient, the official shall file the petition and call a recall election to be held on the Tuesday of the 6th week commencing after the date of filing of the petition.
(Emphasis added.)
¶ 177. Subsection (3)(f) provides that "If a recall primary is required, the date specified under par. (b) shall be the date of the recall primary and the recall election shall be held on the Tuesday of the 4th week commencing after the recall primary or, if that Tuesday is a legal holiday, on the first day after that Tuesday which is not a legal holiday."
¶ 178. Subsection (3), too, is important in this matter. First, the statute builds in certain protections for a public officer against whom a recall petition is *112 filed. Consequently, no recall primary or recall election may proceed until the official with whom the petition is filed certifies the recall and orders a recall election. The review process can be very time consuming, especially if all available process is utilized.
¶ 179. In this case, recall elections were certified by the Government Accountability Board as follows:
2011

Officer Recall Certified

District 2 (Robert Cowles) June 3, 2011
District 8 (Alberta Darling) June 3, 2011
District 10 (Sheila Harsdorf) June 3, 2011
District 12 (Jim Holperin) June 10, 2011
District 14 (Luther Olsen) June 3, 2011
District 18 (Randy Hopper) June 3, 2011
District 22 (Robert Wirch) June 10, 2011
District 30 (Dave Hansen) June 10, 2011
District 32 (Dan Kapanke) June 3, 2011
2012

Officer Recall Certified

Governor Scott Walker March 30, 2012
Lt. Governor Rebecca Kleefisch March 30, 2012
District 13 (Scott Fitzgerald) March 30, 2012
District 21 (Van Wanggaard) March 30, 2012
District 23 (Terry Moulton) March 30, 2012
District 29 (Pam Galloway) March 30, 2012
¶ 180. Second, Wis. Stat. § 11.26 sets limits on contributions, as defined in Wis. Stat. § 11.01(6). However, subsection (13m) of § 11.26 contains two specific exceptions to these contribution limits:
*113 Contributions utilized for the following purposes are not subject to limitation by this section:
(a) For the purpose of payment of legal fees and other expenses incurred as a result of a recount at an election.
(b) For the purpose of payment of legal fees and other expenses incurred in connection with the circulation, offer to file or filing, or with the response to the circulation, offer to file or filing, of a petition to recall an officer prior to the time a recall primary or election is ordered, or after that time if incurred in contesting or defending the order.
(Emphasis added.)
¶ 181. The plain language of Wis. Stat. § 11.26(13m) provides that there is no limitation on contributions for payments made for certain purposes from the date a recall campaign is registered until the date a recall election is ordered. There also is no limitation on contributions for payment of legal fees and other expenses incurred as a result of a recount.
¶ 182. For the nine successful recall petitions in 2011, the periods of exemption were as follows:
District 2 March 2, 2011 — June 3, 2011 = 94 days
District 8 March 2, 2011 — June 3, 2011 = 94 days
District 10 March 2, 2011 — June 3, 2011 = 94 days
District 12 February 22, 2011 — June 10, 2011 = 109 days
District 14 March 2, 2011 — June 3, 2011 = 94 days
District 18 March 2, 2011 — June 3, 2011 = 94 days
District 22 February 24, 2011 — June 10, 2011 = 107 days
District 30 February 25, 2011 — June 10, 2011 = 106 days
District 32 March 2, 2011 — June 3, 2011 = 94 days
¶ 183. For the six successful recall petitions for 2012, the periods of exemption were as follows:
*114 Governor November 15, 2011--March 30, 2012 ¡ 137 days
Lt. Governor November 15, 2011--March 30, 2012 : 137 days
District 13 November 15, 2011--March 30, 2012 ; 137 days
District 21 November 15, 2011--March 30, 2012 137 days
District 23 November 15, 2011--March 30, 2012 ; 137 days
District 29 November 15, 2011--March 30, 2012 ■ 137 days
¶ 184. There were two recounts during the period under review — the statewide recount of the 2011 supreme court election and the recount in Senate District 21 in 2012.
¶ 185. During periods of exemption, individuals and organizations that are permitted to make contributions to recall campaigns may make unlimited contributions to support or oppose a recall effort. If these individuals and organizations are permitted to support or oppose recall efforts with unlimited contributions during exempt periods, they are likewise permitted to seek contributions during these periods and to make contributions during these periods that will be lawful in periods that are not exempt under Wis. Stat. § 11.26(13m).
¶ 186. In 2011 there were 156 exempt days between February 22 and December 31 related to recall elections. In 2012 there were 90 exempt days between January 1 through March 30 related to recall elections.
¶ 187. In sum, irrespective of any First Amendment or due process limitations on the regulation of campaign finance, Wisconsin campaign finance statutes were largely inapplicable during 246 of the days under investigation, by virtue of Wis. Stat. § 11.26(13m). This figure does not include exempt days for fundraising and contributions to pay for the 2011 statewide recount for the supreme court.
*115 III
¶ 188. On June 5, 2012, Governor Walker won the recall election with more than 53 percent of the vote. Walker was the third governor in United States history to be recalled. He was the first to be reelected.
¶ 189. Approximately two months later, on August 10, 2012, a Milwaukee County assistant district attorney, David Robles, filed a petition for commencement of this John Doe investigation in Milwaukee County. The petition was filed in Milwaukee County Circuit Court. The petition sought leave to investigate alleged campaign finance violations and requested a secrecy order to cover the investigation in anticipation that documents would be sought from "[- -] personal campaign committee . . . and . . . related organizations."
¶ 190. The petition necessitated the appointment of a John Doe judge. The judge appointed was Barbara Kluka, a prominent reserve judge from Kenosha County. Issues related to this appointment are presently before the court. I am not persuaded that there are defects in Judge Kluka's appointment.
¶ 191. On September 5, 2012, Judge Kluka granted the petition and issued an order for commencement of the John Doe proceeding. The same day, Judge Kluka granted a secrecy order.
¶ 192. The next day, the Milwaukee County District Attorney's Office sought and received search warrants for the private e-mail accounts of 13 individuals, including [-]. The private e-mail accounts were obtained from [- *116 -]. The search warrants required the recipient "electronic communication service providers" to produce
all communications stored in the accountfs] including all incoming and outgoing e-mail; subscriber names, user names, screen names or other identities associated with the accountfs]; mailing addresses, residential addresses, business addresses, other e-mail addresses, telephone numbers or other contact or identifying information for [these] account [s] (in electronic or other form); billing records; contact lists, information about length of service, types of services or related information; connection logs and records of user activity, and any information related to sent and received communications, including any "chat" or "instant messaging” or related information for said accountfs] ....
(Emphasis added.) The time frame for the search warrants was from April 11, 2009, to July 1, 2012.
¶ 193. The district attorney's office also obtained either a search warrant or a subpoena duces tecum for conference call records from [-] and for three bank accounts from a bank. All these search warrants and subpoenas were subject to a secrecy order.
¶ 194. On December 12, 2012, the Milwaukee District Attorney's Office asked for additional search warrants and subpoenas for the private e-mail accounts of 11 additional individuals, as well as additional private accounts for five previously named individuals, including [-]. These accounts were obtained from [12 electronic communication service providers]. E-mail accounts were sought from January 1, 2011, through July 31, 2012. The office also sought bank account records from [a bank] and conference call *117 records from two providers. All these search warrants and subpoenas were subject to a secrecy order.
¶ 195. On January 18, 2013, Milwaukee County District Attorney John Chisholm met with then-Attorney General J.B. Van Hollen to discuss the ongoing investigation. District Attorney Chisolm sought to determine whether, given the statewide nature of the investigation, the Attorney General's office wished to become involved in the investigation. On May 31, 2013, Attorney General Van Hollen sent District Attorney Chisholm a letter declining involvement in the investigation. Attorney General Van Hollen cited, among other things, potential conflicts of interest [- -].
¶ 196. On June 20, 2013, the Government Accountability Board met in closed session in Madison to discuss the investigation. The Board passed two motions [- -] and one to hire special investigators to assist with the investigation.
¶ 197. On July 16, 2013, Francis Schmitz was chosen as a special investigator for the GAB.
¶ 198. In July 2013, three more petitions to commence John Doe proceedings were filed: District Attorney Jane Kohlwey filed a petition in Columbia County on July 22, District Attorney Larry Nelson filed a petition in Iowa County on July 25, and District Attorney Kurt Klomberg filed a petition in Dodge County on July 26. On August 21, District Attorney Ismael Ozanne filed a petition in Dane County to commence a John Doe proceeding. All these petitions included a request that the proceedings be subject to a secrecy order.
*118 ¶ 199. Also on August 21, 2013, the district attorneys from the five counties involved (Milwaukee, Columbia, Iowa, Dodge, and Dane) sent a letter to John Doe Judge Barbara Kluka requesting the appointment of a special prosecutor to oversee the entire investigation. The letter recommended Francis Schmitz. On August 23, Judge Kluka appointed Schmitz to be the special prosecutor for each of the five John Doe investigations.
f 200. On or about October 1, 2013, Special Prosecutor Schmitz applied to Judge Kluka for additional subpoenas and search warrants, supported by lengthy affidavits. The subpoena applications sought information about 29 businesses and organizations, including political party organizations, about a large number of persons who were not candidates, and about all candidates and campaign committees involved in 2011 and 2012 recall elections. The application sought subpoenas for at least 21 businesses, organizations, and party organizations to disclose information about and relationships with all the enumerated businesses, organizations, and individuals noted above. The special prosecutor issued more than 30 subpoenas.
¶ 201. There also were search warrant applications for residences and/or offices of five individuals. These search warrants were very broad in nature and covered the time period from March 1, 2009 to the date the warrants were issued.
¶ 202. The search warrants and subpoenas authorized on or about October 1 by Judge Kluka are at issue before the court.
*119 IV
¶ 203. The first issue for discussion here is the legality of the appointment of Francis Schmitz as the John Doe special prosecutor. On August 21, 2013, district attorneys from the five counties involved in the John Doe investigation sent a letter to Judge Kluka requesting the appointment of a special prosecutor to oversee the entire investigation. The letter recommended the appointment of Francis Schmitz. On August 23, Judge Kluka appointed Schmitz to be the special prosecutor, at a rate of $130 per hour, for the John Doe investigation in each of the five counties.
¶ 204. Wisconsin Stat. § 978.045, entitled "Special prosecutors," constitutes most of the statutory authority for the appointment of special prosecutors.[4] This section, which dates back to 1989,[5] has four subsections. The first two subsections read, in part, as follows:
(lg) A court on its own motion may appoint a special prosecutor under sub. (lr) or a district attorney may request a court to appoint a special prosecutor under that subsection. Before a court appoints a special prosecutor on its own motion or at the request of a district attorney for an appointment that exceeds 6 hours per case, the court or district attorney shall request assistance from a district attorney, deputy district attorney or assistant district attorney from other prosecutorial units or an assistant attorney general. A district attorney requesting the appointment of a special prosecutor, or a court if the court is appointing a special prosecutor on its own motion, shall notify the department of administration, on a *120 form provided by that department, of the district attorney's or the court's inability to obtain assistance from another prosecutorial unit or from an assistant attorney general.
(lr) Any judge of a court of record, by an order entered in the record stating the cause for it, may appoint an attorney as a special prosecutor to perform, for the time being, or for the trial of the accused person, the duties of the district attorney. An attorney appointed under this subsection shall have all of the powers of the district attorney. The judge may appoint an attorney as a special prosecutor at the request of a district attorney to assist the district attorney in the prosecution of persons charged with a crime, in grand jury proceedings or John Doe proceedings under s. 968.26, in proceedings under ch. 980, or in investigations. The judge may appoint an attorney as a special prosecutor if any of the following conditions exist:
Wis. Stat. § 978.045(lg)-(lr).
¶ 205. At this point, the subsection lists nine "conditions" that justify appointment of a special prosecutor:
(a) There is no district attorney for the county.
(b) The district attorney is absent from the county.
(c) The district attorney has acted as the attorney for a party accused in relation to the matter of which the accused stands charged and for which the accused is to be tried.
(d) The district attorney is near of kin to the party to be tried on a criminal charge.
(e) The district attorney is physically unable to attend to his or her duties or has a mental incapacity that impairs his or her ability to substantially perform his or her duties.
*121 (f) The district attorney is serving in the U.S. armed forces.
(g) The district attorney stands charged with a crime and the governor has not acted under s. 17.11.
(h) The district attorney determines that a conflict of interest exists regarding the district attorney or the district attorney staff.
(i) A judge determines that a complaint received under s. 968.26(2)(am) relates to the conduct of the district attorney to whom the judge otherwise would refer the complaint.
Wis. Stat. § 978.045(lr).
¶ 206. Section 978.045 is clear. The court appoints special prosecutors under these two subsections. The court can make an appointment on its own motion or it can make an appointment upon the request of a district attorney. When the court appoints on its own motion, it appoints under the conditions in subsection (lr). When the court appoints upon the request of a district attorney, it appoints "under that subsection," that is, under the conditions of subsection (lr).
¶ 207. Section 978.045 spells out prerequisites for appointments under (lg) and (lr). One of these prerequisites is for the court or district attorney first to request assistance from other prosecutors, including "an assistant attorney general," before appointing a special prosecutor. Because the Milwaukee County District Attorney made a request for assistance to the Wisconsin Attorney General, this prerequisite arguably was satisfied.[6] However, the assumption that the *122 prerequisite was satisfied is grounded on the proposition that if the district attorney or court asks the Department of Justice for assistance, they do not have to ask any other prosecutorial unit. This may be a tenuous proposition.
¶ 208. A second prerequisite is found in the nine conditions of subsection (lr). "The judge may appoint an attorney as a special prosecutor if any of the following conditions exists." (Emphasis added.) If none of the enumerated conditions exists, the judge is not authorized to make an appointment under subsections (lg) and (lr).
¶ 209. There are several reasons why one of the nine conditions must exist in order for the court to make an appointment. First, the Department of Administration is required to pay for a special prosecutor who is properly appointed under these subsections. Wis. Stat. § 978.045(2)(b) ("The department of administration shall pay the compensation ordered by the court from the appropriation under s. 20.475(l)(d).") (emphasis added). The department does not appear to have authority to reject payment for a properly appointed special prosecutor. However, the legislature did establish conditions for these appointments before requiring the department of administration to pay.
*123 ¶ 210. Second, if the conditions in subsection (lr) did not have to be followed, courts could grant requests from district attorneys for an unlimited number of special prosecutors to supplement district attorney staffs.[7] In other words, individual judges could effectively disregard the number of positions for assistant district attorneys set out in statute. Cf. Wis. Stat. § 16.505. District attorneys in the state's largest counties already may appoint "temporary counsel" as authorized by the department of administration. Wis. Stat. § 978.03(3). Section 978.045 does not permit an alliance between a district attorney and a judge to override statutory limitations on prosecutor appointments.
¶ 211. Third, if the conditions in subsection (lr) did not have to be followed, courts could appoint special prosecutors on their own motion for "investigations" of interest to an individual judge without any involvement by the local district attorney. This would present a significant separation of powers issue.
¶ 212. Fourth, courts could appoint special prosecutors with "all the powers of the district attorney," without the accountability of any checks on the special prosecutor's conduct, except from the appointing court. A special prosecutor appointed on the court's own motion would not necessarily be overseen by a district attorney. The special prosecutor could not be recalled *124 or defeated for reelection, never having been elected to the special prosecutor position. The special prosecutor could be appointed by a reserve judge who would never again face the electorate.
¶ 213. All these concerns are blunted if the court adheres to the conditions in subsection (lr). None of these concerns is addressed when the conditions are disregarded.
¶ 214. In State v. Carlson, 2002 WI App 44, 250 Wis. 2d 562, 641 N.W.2d 451, the court of appeals appeared to reach a different conclusion. The court of appeals noted that Wis. Stat. § 978.045 "authorizes two distinct ways in which a court may appoint a special prosecutor." Id., ¶ 8. The court said:
Carlson directs us to the sentence in the statute that authorizes the court's appointment of a special prosecutor when it is at the request of a district attorney. . . . We agree with Carlson that the part of the statute that he relies upon for his argument lists, and arguably restricts, the circumstances in which a court may appoint a special prosecutor.[4] However, any restriction, if one exists, is triggered only when the appointment is made at the request of a district attorney, not when the appointment is made by a court on its own motion.
Id. (emphasis added).
¶ 215. Footnote 4 in the court's opinion reads as follows:
The part of the statute that Carlson relies upon states: "The judge may appoint an attorney as a special prosecutor at the request of a district attorney to assist the district attorney in the prosecution of persons charged with a crime, in grand jury or John Doe proceedings or in investigations." Wis. Stat. § 978.045(lr)[(1999-2000)].
*125 Id,., ¶ 8 n.4. The quoted statutory sentence has been broadened to include "proceedings under ch. 980." Wis. Stat. § 978.045(lr).
¶ 216. The Carlson court's analysis is correct except for the language "not when the appointment is made by a court on its own motion." The court of appeals' interpretation of the "on its own motion" language is mistaken because it reads out of subsection (lr) the prerequisite that "[T]he judge may appoint an attorney as a special prosecutor if any" of the nine conditions exists. (Emphasis added.) The court of appeals' interpretation would provide courts, including reserve judges, free rein to make special prosecutor appointments. In my view, such an interpretation contradicts the plain language and the obvious policy embedded in the statute.
¶ 217. The statutory history of the section supports this interpretation. As noted previously, Wis. Stat. § 978.045 was created by 1989 Wis. Act 117, § 5. The first version of the section read in part as follows:
(1) If there is no district attorney for the county, if the district attorney is absent from the county, has acted as attorney for a party accused in relation to the matter of which the accused stands charged and for which he or she is to be tried, is near of kin to the party to be tried on a criminal charge, is unable to attend to his or her duties or is serving in the armed forces of the United States, or if the district attorney stands charged with a crime and the governor has not acted under s. 17.11, any judge of a court of record, by an order entered in the record stating the cause therefor, may appoint some suitable attorney to perform, for the time being, or for the trial of the accused person, the duties of the district attorney, and the attorney so appointed shall have all the powers of the district attorney while so acting.
*126 ¶ 218. This original subsection based judicial appointment of a special prosecutor on the existence of one or more specified conditions. The statutory history of § 978.045 shows that this qualification has been carried forward consistently in each revision of the statute.
¶ 219. It should also be noted that the original section listed six conditions permitting judicial appointment. Since 1989 three more conditions have been added. Why would the legislature keep adding new justifications for the appointment of a special prosecutor if the appointing court could simply enter an order in the record "stating the cause" for the appointment? A court must state the cause for an appointment in its order so that the department of administration is informed why it must pay for compensation.
¶ 220. Section 978.045(lg) reads in part: "A district attorney requesting the appointment of a special prosecutor, or a court if the court is appointing a special prosecutor on its own motion, shall notify the department of administration, on a form provided by that department, of the district attorney's or the court's inability to obtain assistance from another prosecutorial unit or from an assistant attorney general." (Emphasis added.) In fact, the principal form used by courts when they appoint a special prosecutor is CR-210, developed by the Wisconsin Court Records Management Committee of the Wisconsin Supreme Court. See Exhibit 1. The Department of Administration approves this form.
¶ 221. Form CR-210 tracks Wis. Stat. § 978.045(lr). At the bottom, Form CR-210 states: "This form shall not be modified. It may be supplemented by additional material." (Emphasis added.)
*127 ¶ 222. Five district attorneys asked Judge Kluka to appoint a special prosecutor. They asked her to appoint Francis Schmitz. They explained the reasoning for the appointment of a special prosecutor. They advised her how to justify the appointment of a special prosecutor. They even explained the amount that Attorney Schmitz would accept as compensation.
¶ 223. Two days later Judge Kluka made the requested appointment of Francis Schmitz. The appointment order was titled "APPOINTMENT OF SPECIAL PROSECUTOR UNDER CHAPTER 978." The order disregarded CR-210 and created a new document following the analysis in the district attorneys' letter. It twice cited the letter and even repeated the unusual citation of State v. Cummings, 199 Wis. 2d 721, 546 N.W.2d 406 (1996), and the mis-citation of State v. Carlson in the letter.
¶ 224. Judge Kluka's order stated:
I make this appointment in light of the facts and circumstances set forth in the August 21, 2013 letter submitted by the District Attorneys for the counties of Columbia, Dane, Dodge, Iowa and Milwaukee. I make this appointment under my authority as expressed in State v. Carlson, 2002 WI App 44, 250 Wis. 2d 562, 641 N.W.2d 562 [sic]. I find that a John Doe run by five different local prosecutors, each with a partial responsibility for what is and ought to be one overall investigation and prosecution, is markedly inefficient and ineffective. Consequently, I also make this appointment as part of my inherent authority under State v. Cummings, 199 Wis. 2d 721, 735, 546 N.W.2d 406, 411 (1996).
¶ 225. Inasmuch as Judge Kluka appointed a special prosecutor for each of five counties two days after receiving a joint letter signed by the district *128 attorney in each of the five counties, and inasmuch as the judge appointed the very person the district attorneys recommended to be special prosecutor and authorized precisely the amount of compensation the district attorneys said their nominee would accept, and inasmuch as the judge twice cited the letter of request from the district attorneys in her order, followed the letter's legal analysis, utilized the cases contained in the letter, and even repeated a mis-citation of a case in the letter, it is simply not possible to contend that the court was acting on its own motion. Judge Kluka did not check personally to see whether any other prosecutorial units could assist in the John Doe. Instead, she accepted as fact and law everything the district attorneys presented to her. Thus, even under the half-correct decision in Carlson, the special prosecutor appointment violated the appointment statute if it did not satisfy one of the nine "conditions" in subsection (lr).
¶ 226. Judge Kluka made a gesture to comply with the statute. Her order stated: "The Attorney General and the District Attorneys ... all note that their individual status as partisan elected prosecutors gives rise to the potential for the appearance of impropriety. I find that the Special Prosecutor will eliminate any appearance of impropriety."
¶ 227. This "finding" is plainly insufficient. The Milwaukee County District Attorney's Office had been investigating [-] since August 10, 2012, the day it petitioned for the second John Doe, without concern for the "appearance of impropriety." It obviously had been investigating [-] even longer in light of the materials presented in the affidavits supporting the petition for the John Doe and the search warrants and subpoenas requested in 2012. *129 This is markedly different from the Department of Justice, which in 2013 [- -].
¶ 228. In any event, "the appearance of impropriety" is not the same as "a conflict of interest" as set out in Wis. Stat. § 978.045(lr)(h). If this potential "appearance" were deemed a conflict of interest, the five district attorneys and their staffs should have withdrawn from the case. They did not.
¶ 229. Thus, Judge Kluka's order failed to satisfy any of the nine conditions stated in subsection (lr). That is why the judge disregarded CR-210 and submitted a different order.
¶ 230. That also is why the order attempts to sever the relationship between the district attorneys and the court and to claim that the judge was acting on her own motion. The problem is twofold, beyond the implausibility of the claim. A court acting on its own motion also must satisfy one or more of the conditions in subsection (lr) if the judge is acting under Wis. Stat. § 978.045. The court simply cannot read out these conditions of the statute. Moreover, the statute itself links district attorneys and the court's appointment of special prosecutors for John Does. See also Wis. Stat. § 968.26.
¶ 231. The judge's second gambit to support the appointment of the special prosecutor was to invoke "inherent authority" under Cummings, 199 Wis. 2d at 735. This theory is completely at odds with the title of the order: "APPOINTMENT OF SPECIAL PROSECUTOR UNDER CHAPTER 978." Appointments made under the "inherent authority" of the court, if such authority exists in this matter, do not require payment by the Department of Administration because they are not made in conformity with Chapter 978.
*130 ¶ 232. In my view, the Cummings case does not recognize "inherent authority" to appoint a special prosecutor, especially in a John Doe matter. In Cummings, the court stated the relevant issues as follows: "(1) does a John Doe judge have the power to issue a search warrant; (2) does a John Doe judge have the power to seal a search warrant. . . ." Cummings, 199 Wis. 2d at 729. The court then observed:
Next, defendant asserts that a John Doe judge does not have the authority to seal a search warrant. It is true that there is no statutory authority in Wisconsin granting judges this ability. However, a John Doe judge has been granted jurisdiction, the legal right to exercise its authority, pursuant to Wis. Stat. § [968.26], A grant of jurisdiction by its very nature includes those powers necessary to fulfill the jurisdictional mandate.
Id. at 735-36. "The ability to seal a search warrant is exactly that type of power which a John Doe judge needs to fulfill the above jurisdictional mandate." Id. at 736-37.
¶ 233. The same cannot be said about the "inherent authority" to appoint a special prosecutor for a John Doe proceeding.
¶ 234. Judicial power to appoint a John Doe special prosecutor is governed by statute, in the same way that John Doe proceedings themselves have always been governed by statute. State v. Washington, 83 Wis. 2d 808, 819, 266 N.W.2d 597 (1978).
¶ 235. One statute, Wis. Stat. § 978.045, has already been discussed. It sets conditions for the appointment of a special prosecutor paid for by the state, and those conditions have not been satisfied here.
¶ 236. The other statute is the John Doe statute, Wis. Stat. § 968.26. This statute reads in part:
*131 (1) If a district attorney requests a judge to convene a proceeding to determine whether a crime has been committed in the court's jurisdiction, the judge shall convene a proceeding described under sub. (3) and shall subpoena and examine any witnesses the district attorney identifies.
(am)... [I] f a person who is not a district attorney complains to a judge that he or she has reason to believe that a crime has been committed within the judge's jurisdiction, the judge shall refer the complaint to the district attorney ....
(b). . . [T]he district attorney [then] shall, within 90 days of receiving the referral, issue charges or refuse to issue charges. If the district attorney refuses to issue charges .. . [t]he judge shall convene a proceeding ... if he or she determines that a proceeding is necessary to determine if a crime has been committed. .. .
(c) In [such] a proceeding . . . the judge shall subpoena and examine under oath the complainant and any witnesses that the judge determines to be necessary and appropriate to ascertain whether a crime has been committed and by whom committed. The judge shall consider the credibility of testimony in support of and opposed to the person's complaint.
(d). . . [T]he judge may issue a criminal complaint if the judge finds sufficient credible evidence to warrant a prosecution of the complaint. . ..
¶ 237. This statute suggests that a judge has authority to proceed with a John Doe and, perhaps eventually, appoint a special prosecutor (but not under Chapter 978) if "the district attorney refuses to issue charges . . . Whatever the statute implies, it is inap *132 plicable in this case because of the proactive involvement of the district attorneys.
¶ 238. The Cummings case notes that "a John Doe judge does not have the statutory powers of a court. . . . This conclusion is indubitably correct. ... [A] John Doe judge . . . enjoys those powers conferred to all judges by statute." Cummings, 199 Wis. 2d at 738.
¶ 239. Judicial power to appoint a special prosecutor is governed by statute. If "inherent authority" were permitted to trump the applicable statutes governing John Doe appointments, the restrictions in these statutes would be rendered meaningless. This court cannot permit that to happen. Cf. State v. Henley, 2010 WI 97, ¶ 76, 328 Wis. 2d 544, 787 N.W.2d 350. Judge Kluka's appointment of the special prosecutor was invalid.
V
¶ 240. The second issue for discussion is the validity of the search warrants and subpoenas sought by the special prosecutor on or about October 1, 2013. As noted above, the John Doe judge approved extremely broad search warrants for five individuals and at least 31 very broad subpoenas.
¶ 241. Motions to quash some of the subpoenas were filed on October 17 and October 25, 2013. On October 29, Judge Kluka recused herself from the entire proceeding, citing an unspecified conflict. Thereafter, the John Doe was reassigned to Reserve Judge Gregory Peterson of Eau Claire, who previously served as a member of the Wisconsin Court of Appeals.
¶ 242. Following various writ applications in the court of appeals and petitions in two circuit courts, the new John Doe judge granted the motions to quash the *133 subpoenas and to return property seized under the search warrants. The judge's decision was issued on January 10, 2014. This court must determine whether Judge Peterson's decision should be affirmed or reversed.
¶ 243. Judge Peterson's decision is grounded in his interpretation of Wisconsin election law as affected by the First Amendment. He noted specifically that the "subpoenas reach into the areas of First Amendment freedom of speech and freedom of association. As a result, I must apply a standard of exacting scrutiny and, in interpreting statutes, give the benefit of any doubt to protecting speech and association."
¶ 244. The judge wrote:
I am granting the motions to quash and ordering return of any property seized as a result of the subpoenas. I conclude the subpoenas do not show probable cause that the moving parties committed any violations of the campaign finance laws. I am persuaded the statutes only prohibit coordination by candidates and independent organizations for a political purpose, and political purpose, with one minor exception not relevant here ... requires express advocacy. There is no evidence of express advocacy.
¶ 245. Judge Peterson then wrote that "The subpoenaed parties raise other issues in their briefs, some quite compellingly. However, given the above decision, it is not necessary to address those issues." This writing will address some of the issues related to the search warrants and subpoenas as Judge Peterson's decision can be affirmed on additional grounds.
¶ 246. The Fourth Amendment to the United States Constitution reads as follows:
The right of the people to be secure in their persons, houses, papers, and effects, against unreason *134 able searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
The equivalent provision in the Wisconsin Constitution is found in Article I, Section 11.[8]
¶ 247. These constitutional provisions are implemented in Wisconsin by several statutes, including Wis. Stat. §§ 968.12 (Search warrant), 968.13 (Search warrant: property subject to seizure), 968.14 (Use of force), 968.15 (Search warrants; when executable), 968.16 (Detention and Search of persons on premises), 968.17 (Return of search warrant), 968.18 (Receipt for seized property), 968.19 (Custody of property seized), 968.20 (Return of property seized), 968.205 (Preservation of certain evidence), 968.23 (Forms), 968.27 (Definitions), 968.28 (Application for court order to intercept communications), 968.29 (Authorization for disclosure and use of intercepted wire, electronic or oral communications), 968.30 (Procedure for interception of wire, electronic or oral communications), and 968.375 (Subpoenas and warrants for records or communications of customers of an electronic communication service or remote computing service provider). Nestled among these search warrant statutes is Wis. Stat. § 968.135, which deals with "Subpoena for documents."
¶ 248. Judicial interpretation of the Fourth Amendment can narrow application of the Wisconsin search warrant statutes. The statutes, in turn, may *135 provide limitations on warrants that are not required by the Fourth Amendment.
¶ 249. Questions about the search warrants and subpoenas arise here in the context of a John Doe proceeding. The nature of such a proceeding must be understood.
¶ 250. The John Doe statute, as amended in 2009, 2009 Wis. Act 24, reads in part as follows:
(1) If a district attorney requests a judge to convene a proceeding to determine whether a crime has been committed in the court's jurisdiction, the judge shall convene a proceeding described under sub. (3) and shall subpoena and examine any witnesses the district attorney identifies.
(3) The extent to which a judge may proceed in an examination under sub. (1) or (2) is within the judge's discretion. The examination may be adjourned and may be secret. . . .
Wis. 2d 968.26(1), (3).
¶ 251. In Cummings, this court held that "a John Doe judge may issue and seal a search warrant under appropriate circumstances." Cummings, 199 Wis. 2d at 730. The court added: "The John Doe statute need not specifically mention the issuance of search warrants for a John Doe judge to have such power." Id. at 734-35. The court said:
[Statutes should be interpreted in a manner which supports their underlying purpose. This court has repeatedly held that the John Doe proceeding was designed as an investigatory tool to be used as an "inquest for the discovery of crime." Washington, 83 Wis. 2d at 822. Denying John Doe judges the ability to *136 issue search warrants would seriously reduce the investigatory power of the John Doe proceeding.
Id. at 735 (citations omitted).
¶ 252. The fact that a John Doe judge may issue search warrants and subpoenas for documents does not mean that the Fourth Amendment has no application in a John Doe proceeding. On the contrary, special vigilance on the part of a John Doe judge may be required.
¶ 253. The documents initiating a John Doe investigation "need not name a particular accused; nor need it set forth facts sufficient to show that a crime has probably been committed. The John Doe is, at its inception, not so much a procedure for the determination of probable cause as it is an inquest for the discovery of crime . . . ." Washington, 83 Wis. 2d at 822. Because the threshold for commencing a John Doe investigation is relatively low, a John Doe judge is responsible for limiting its scope to prevent the investigation from getting out of hand. This is why "The John Doe investigation is essentially limited to the subject matter of the complaint upon which the John Doe is commenced. The John Doe judge has no authority to ferret out crime wherever he or she thinks it might exist." Id. Likewise, a district attorney's use of a John Doe is limited.
¶ 254. This limitation on the scope of the John Doe is particularly relevant to the scope of search warrants and subpoenas. In Custodian of Records v. State, 2004 WI 65, ¶ 34, 272 Wis. 2d 208, 680 N.W.2d 792, a John Doe case, this court observed:
[D]oes the issuance of a subpoena in a John Doe proceeding, the sole purpose of such proceeding being to investigate alleged criminal activity, have the po *137 tential to affect Fourth Amendment rights? The issue of whether the subpoena is overbroad and oppressive, and thus unreasonable, was raised by [the head of the Legislative Technology Services Bureau (LTSB)]. This is a Fourth Amendment concern. Hale v. Henkel, 201 U.S. 43, 71 (1906) (noting that a subpoena duces tecum may implicate Fourth Amendment rights).
¶ 255. The court ultimately concluded, following the two-step test set out in Katz v. United States, 389 U.S. 347 (1967), that there was a reasonable expectation of privacy in the data stored on backup tapes in the LTSB and thus the subpoena was overbroad. Id., ¶ 43. The court added:
When we examine whether the Fourth Amendment was violated, we determine whether the government intrusion was reasonable. Overly broad subpoenas typically are held unreasonable in that their lack of specificity allows the government to go on an indiscriminate fishing expedition, similar to that provided by a general warrant. Marron v. United States, 275 U.S. 192, 196 (1927); Boyd [v. United States, 116 U.S. 616, 625-26 (1886)]. As the United States Supreme Court has explained, a subpoena is "equally [as] indefensible as a search warrant would be if couched in similar [general] terms. Hale, 201 U.S. at 77.
Custodian of Records, 272 Wis. 2d 208, ¶ 50.
¶ 256. This case involves multiple unnamed parties but it also involves many, many additional organizations and individuals. One unnamed party writes of its subpoena:
The scope of the subpoenas required — explicitly, implicitly, or in effect — all material of any kind that related in any way to the identified elections and to the identified individuals or entities. Other than naming organizations and individuals, there was no attempt to *138 limit or to filter the material subpoenaed or to distinguish between potentially regulated speech and unregulated speech.
¶ 257. Another unnamed party declared in its brief:
At no point does the subpoena seek to differentiate materials and documents which relate to the subject of the John Doe, to wit: the recall elections of 2011 and 2012, from other activities in which the movants were engaged during that period. The broad sweeping request demands production of all the specific items in the possession of the movant organizations and their representatives.
¶ 258. The subpoenas issued on or about October 1, 2013, are actually narrower than the search warrants issued in 2012, as described in the quoted material in ¶ 192 above.
¶ 259. To illustrate the breadth of the search warrants and subpoenas, the special prosecutor now has possession of every private e-mail sent by [- -] or received by [-] between April 11, 2009, and July 31, 2012, together with other information demanded from certain internet service providers. The special prosecutor has [-] private e-mails for more than 20 months [- -] and 19 months [- -] — as a result of this John Doe investigation. This does not include information prosecutors obtained from government e-mail accounts that are alluded to in the record.
¶ 260. The substance of the captured e-mails inevitably includes communications with family members and personal friends, public officials and members of [-] staff, party leaders and political strate *139 gists, fundraisers, contributors, and other allies, lawyers, health care providers, and other professional acquaintances. It is inconceivable that a public official [-] would not subjectively expect a reasonable degree of privacy in his private e-mail accounts.[9]
¶ 261. The issue before us involves much more than [-] and the many other individuals and organizations directly affected by the search warrants and subpoenas. The issue before us is central to our time. How much information about our people is government entitled to obtain — without people's consent and perhaps without their knowledge?
¶ 262. The precedent set by this case has the potential to affect the privacy rights of millions of Wisconsin citizens. "Among online adults, 92% use email, with 61% using it on an average day."[10] Cell phones and smart phones are, of course, ubiquitous in our society, but countless numbers of people communicate by e-mail and texting. The ability of government to capture — without notice — the substance of our non-aural communications is not dissimilar to government wiretaps that record the substance of telephone conversations. The only difference is that wiretaps disclose the content of telephone conversations in real time.[11]
*140 ¶ 263. Concerns about privacy are especially critical when people engage in aspects of speech and association during political campaigns, "an area of the most fundamental First Amendment activities." Buckley v. Valeo, 424 U.S. 1, 14 (1976). The Supreme Court provided guidance in Zurcher v. Stanford Daily, 436 U.S. 547, 564 (1978), when it said:
[I]n issuing warrants and determining the reasonableness of a search, state and federal magistrates should be aware that "unrestricted power of search and seizure could also be an instrument for stifling liberty of expression." Marcus v. Search Warrant, 367 U.S. 717, 729 (1961). Where the materials sought to be seized may be protected by the First Amendment, the requirements of the Fourth Amendment must be applied with "scrupulous exactitude." Stanford v. Texas, 379 U.S. [476, 485 (1965)]. A seizure reasonable as to one type of material in one setting may be unreasonable in a different setting or with respect to another kind of material." Roaden v. Kentucky, 413 U.S. 496, 501 (1973). Hence, in Stanford v. Texas, the Court invalidated a warrant authorizing the search of a private home for all books, records, and other materials relating to the Communist Party, on the ground that whether or not the warrant would have been sufficient in other contexts, it authorized the searchers to rummage among and make judgments about books and papers and was the functional equivalent of a general warrant, one of the principal targets of the Fourth *141 Amendment. Where presumptively protected materials are sought to be seized, the warrant requirement should be administered to leave as little as possible to the discretion or whim of the officer in the field.
¶ 264. The violation of Fourth Amendment rights requires special attention when it has a chilling effect on First Amendment freedoms. Cf. NAACP v. Alabama, 357 U.S. 449 (1958).
¶ 265. The search warrants and subpoenas in this case are so broad and so extensive that they make the fruits of the legendary Watergate break-in look insignificant by comparison.[12] After all, the special prosecutor has access to thousands and thousands of electronic communications about the 2010 election, Act 10, the 2011-13 state budget, other legislation, all the recall elections and the strategies and fundraising efforts employed in them, [-], litigation, and the then-upcoming 2012 general election. As the substance of this John Doe leaks out, as it already has, the search warrants and subpoenas have an eerie similar *142 ity to SLAPP suits in a civil context.[13] SLAPP suits have the effect, whether intended or not, to cost defendants tremendous amounts of money, to extract. privileged information from them, and to cause the defendants and others to withdraw from the political process out of fear of harassment.
¶ 266. The special prosecutor insists that he had probable cause for all his investigative efforts. This is sharply disputed. In any event, probable cause for a search warrant may be wholly devoid of probable cause that the recipient of the search warrant or subpoena or even the subject of the search warrant or subpoena has committed any crime. Rather, the supposed probable cause is that evidence that will aid in the conviction of some crime will be found in the place to be searched, particularly if the items to be seized include everything found at that place — here, the e-mail accounts of people who have been targeted.
¶ 267. This sort of probable cause must be weighed against the privacy being invaded by the search warrants and subpoenas. The special prosecutor has not been targeting terrorists or mobsters who impose an imminent danger to society. Covering up the breathtaking extent of the John Doe investigation through secrecy orders is highly problematic and cannot last.[14]
*143 ¶ 268. I conclude the following:
1. The search warrants and subpoenas issued on or about October 1, 2013, are invalid because they were presented by a special prosecutor who had none of the powers of a district attorney because his appointment was invalid.
2. The search warrants and subpoenas issued on or about October 1, 2013, were unconstitutionally overbroad because they covered a time period before recall elections were even contemplated, thereby exceeding the subject matter of the investigation; included all periods of exemption within the time period —246 days — thereby permitting secret investigation of lawful First Amendment activities; lacked the level of particularity required as to those things that might lawfully be seized; and improperly invaded the privacy of persons who were not suspects by seeking information virtually without limitation.
3. The search warrants and subpoenas issued in September and December 2012 were unconstitutionally overbroad, for the reasons stated in point 2, but especially because they dated back more than 21 months before recalls were contemplated, a period unrelated to the recall elections in 2011 and 2012, the purported subject of the John Doe.
¶ 269. Consequently, I would affirm the decision of Judge Peterson to quash the subpoenas and return *144 seized property and expand his ruling to cover the search warrants and subpoenas issued in September and December of 2012.
VI
¶ 270. Chapter 11 of the Wisconsin Statutes is the source of most Wisconsin statutory law on the regulation of campaign finance. Much of the chapter was created in 1974, Chapter 334, Laws of 1973, in the wake of the Watergate scandal. Various provisions have been revised over the years, but the 2011-12 version of the statutes contains a number of provisions that are suspect or unconstitutional. These will be discussed below.
A
¶ 271. Section 11.01 sets out the definitions used in Chapter 11. Subsection (16) defines "political purpose," which Judge Peterson and the majority opinion deem critical to the interpretation and enforcement of the chapter.
¶ 272. Section 11.01(16) reads in part as follows:
(16) An act is for "political purposes" when it is done for the purpose of influencing the election or nomination for election of any individual to state or local office, for the purpose of influencing the recall from or retention in office of an individual holding a state or local office,... or for the purpose of influencing a particular vote at a referendum. In the case of a candidate, or a committee or group which is organized primarily for the purpose of influencing the election or nomination for election of any individual to state or local office, for the purpose of influencing the recall from or retention in office of an individual holding a *145 state or local office, or for the purpose of influencing a particular vote at a referendum, all administrative and overhead expenses for the maintenance of an office or staff which are used principally for any such purpose are deemed to be for a political purpose.
(a) Acts which are for "political purposes" include but are not limited to:
1. The making of a communication which expressly advocates the election, defeat, recall or retention of a clearly identified candidate or a particular vote at a referendum.
2. The conduct of or attempting to influence an endorsement or nomination to be made at a convention of political party members or supporters concerning, in whole or in part, any campaign for state or local office.
(b) A "political purpose" does not include expenditures made for the purpose of supporting or defending a person who is being investigated for, charged with or convicted of a criminal violation of state or federal law, or an agent or dependent of such a person.
¶ 273. "Political purpose" is a very imprecise term, especially when it is defined by phrases such as "influencing the recall from or retention in office of an individual." (Emphasis added.) What does "influencing" mean?
¶ 274. Paragraph (a) provides that "Acts which are for 'political purposes' include but are not limited to: 1. The making of a communication which expressly advocates the election, defeat, recall or retention of a clearly identified candidate . . . ." (Emphasis added.) Plainly, the statute seeks to reach "acts" beyond express advocacy that "influence" elections. Consequently, there are no bright lines in the subsection, as *146 drafted, leaving it so vague that it has the potential of chilling constitutionally permissible activity that permits no regulation.
¶ 275. The definition of "political purpose" has been controversial for years. The original definition, dating back to 1974, read, in part: "an act is for 'political purposes' when, by its nature, intent or manner it directly or indirectly influences or tends to influence voting at any election."
¶ 276. Attorney General Bronson La Follette was asked to address this definition in an opinion. The Attorney General wrote:
This section... evidences a legislative intent to restrict and regulate a broad scope of political activity, including that which may not be directly related to the electoral process. This sweeping effort to regulate First Amendment activity, in light of Buckley, may be constitutionally overbroad unless subject to narrow interpretation and application.
The Court adopted the standard of "express advocacy" of the election or defeat of a particular candidate as an acceptably narrow definition of activity subject to regulation.
I am of the opinion that the "express" advocacy standard should be applied by the [State Elections] Board to all phases of political activity regulated under Ch. II .
65 Wis. Op. Att'y Gen. 145, 151-52 (1976).
¶ 277. The Elections Board ran into trouble in 1999 in Elections Board v. Wisconsin Manufacturers & Commerce, 227 Wis. 2d 650, 597 N.W.2d 721 (1999), in *147 a dispute about express advocacy. The issue appeared again in Wisconsin Prosperity Network v. Myse, 2012 WI 27, 339 Wis. 2d 243, 810 N.W.2d 356.
¶ 278. When the government enacts criminal penalties to regulate First Amendment activities that do not constitute express advocacy, it is standing on perilous ground.
B
¶ 279. The affidavit supporting the commencement of the John Doe twice cited Wis. Stat. § 11.26, which is the statute entitled "Limitations on contributions." This statute limits individual contributions to the campaign committee of a candidate for governor or lieutenant governor to $10,000, § 11.26(l)(a), and $1,000 to the committee of a candidate for state senator, § 11.26(l)(b). The statute limits contributions from a committee other than a political party or legislative campaign committee to the committee of a candidate for governor to 4% of the value of the disbursement level in the schedule under Wis. Stat. § 11.31. Wis. Stat. § 11.26(2)(a). This now amounts to $43,128. Wis. Stat. § 11.31(l)(a). However, a committee other than a party committee may contribute only $1,000 to the committee of a candidate for state senator. Wis. Stat. § 11.26(2)(b).
¶ 280. The individual contribution limits in the statute for candidates for governor, lieutenant governor, and state senator were exactly the same in 2011-2012 as they were in 1975. See Wis. Stat. § 11.26(l)(a) and (b) (1975-76). If the limits on individual contributions to the committees of these candidates had kept pace with the buying power of our currency, the contribution limits at the start of 2011 *148 would have had to be 4.42 times higher — i.e., $44,201.67 for governor. Over the years the limit on contributions from a committee to the committee of a candidate for state senator increased from $500 in 1975 to $1,000 in 2011, provided the candidate in 1975 had no primary. Wis. Stat. §§ 11.26(2)(b) and 11.31(l)(e). If the 1975 candidate had a primary, the maximum committee contribution for the election was $800.
¶ 281. Individual contribution limits have been consistently upheld beginning with Buckley, 424 U.S. at 23-35. Buckley acknowledged, however, that given "the important role of contributions in financing political campaigns, contribution restrictions could have a severe impact on political dialogue if the limitations prevent candidates and political committees from amassing resources necessary for effective advocacy." Id. at 21. Inasmuch as static contribution limits render contributions today worth only 25 percent of their value 35 years ago, many candidates are forced to look for support from expenditures outside their own committees.
C
¶ 282. Subsection (9) of Wis. Stat. § 11.26 is critically important in relation to the contribution limits. It provides:
(9)(a) No individual who is a candidate for state or local office may receive and accept more than 65 percent of the value of the total disbursement level determined under s. 11.31 for the office for which he or she is a candidate during any primary and election campaign combined from all committees subject to a filing requirement, including political party and legislative campaign committees.
*149 (b) No individual who is a candidate for state or local office may receive and accept more than 45 percent of the value of the total disbursement level determined under s. 11.31 for the office for which he or she is a candidate during any primary and election campaign combined from all committees other than political party and legislative campaign committees subject to a filing requirement.
¶ 283. The practical effect of subsection (9) is that all political party committees may contribute no more than $700,830 directly to the campaign committee of a candidate for governor, nor more than $22,425 directly to the committee of a candidate for state senator, except for exempt contributions under Wis. Stat. § 11.26(13m). However, in all actual elections, including recall elections, every dollar received from a non-party committee reduces the amount that the candidate may receive from a party committee.
¶ 284. Political action committees collectively may contribute no more to a candidate for governor than 45 percent of the schedule in Wis. Stat. § 11.31, namely, $486,090, or to a candidate for state senator, no more than $15,525, except for exempt contributions under Wis. Stat. § 11.26(13m). The effect of this law is obvious. Political party committees singularly or collectively and political action committees collectively are never permitted — at the same time — to give the maximum contributions allowed by law for regular election expenses. In fact, some political action committees may be precluded altogether from making a direct contribution to the committee of a candidate for governor or a candidate for state senator.
¶ 285. To illustrate, all non-party committees may contribute only $15,525 to a state senate candidate. Thus, only 15 political action committees may *150 make the maximum contribution of $1,000 to the committee of a candidate for state senator. The sixteenth committee is limited to $525. The seventeenth committee and all other such committees cannot contribute at all. The contributions of these non-party-committees must be reduced if party committees give more than $6,900.
¶ 286. Subsection (9) was challenged in the Wisconsin Supreme Court in Gard v. Wisconsin State Elections Board, 156 Wis. 2d 28, 456 N.W.2d 809 (1990). John Gard, running in a 1987 special election to fill a vacancy in the Assembly, won a hotly contested primary and a close general election. In the process, he received $7,607.32 more from political party committees than the total $11,213 from all committees permitted by subsection (9). He was prosecuted by the state elections board. The petitioners argued that Wis. Stat. § 11.26(9)(a) was unconstitutional on several grounds.
First, [petitioners] claim that the aggregate limit on the amount of money committees may contribute to a candidate's campaign violates committee members' first amendment rights to political expression because it completely bars some committees from making even a symbolic expression of support evidenced by a contribution once the aggregate limit has been reached. Second, they argue that the aggregate limit on committee contributions is, in effect, a limit on the candidate's ability to spend, which impermissibly burdens a candidate's freedom of speech guaranteed by the first amendment under Buckley v. Valeo, 424 U.S. 1, 96 S. Ct. 612, 46 L.Ed.2d 659 (1976). Third, they assert that the statute impermissibly burdens freedom of association also guaranteed by the first amendment by encouraging individuals to disassociate themselves from committees. Fourth, petitioners argue that the statute *151 imposes a greater burden on the first amendment rights of committees than it does on the first amendment rights of individuals in violation of the equal protection clauses of the United States and Wisconsin Constitutions. Petitioners also assert that the statute imposes a greater burden on the first amendment rights of committees who contribute "late" in a campaign than on committees who contribute "early" in a campaign in violation of equal protection guarantees.
Id. at 36.
¶ 287. This court upheld subsection (9) of the 1974 statute, holding that the state had a compelling interest, namely, to prevent corruption or the appearance of corruption, and that the provision was narrowly tailored to accomplish this objective.
¶ 288. The effect of the Gard decision has been to weaken political parties and to encourage non-party committees to engage in issue advocacy spending on campaigns, instead of making direct, reportable contributions to candidates. This dynamic has been recognized for decades.
¶ 289. More recently, however, subsection (9) has come under significant scrutiny. In September 2014, United States District Judge Rudolph Randa entered an order enjoining the GAB from enforcing subsection (9). CRG Network v. Barland, 48 F. Supp. 3d 1191 (E.D. Wis. Sept. 5, 2014). Judge Randa noted that the Supreme Court has demonstrated "increasing impatience" with the type of " 'prophylaxis-upon-prophylaxis' approach" created by statutes such as Wis. Stat. § 11.26(9), and that the other provisions in place to prohibit unlawful circumvention of the base contribution limit rendered subsection (9) unnecessary and unconstitutional. Id. at 1195-96. Following the issuance of Judge Randa's order, the GAB issued a press *152 release stating it would not seek enforcement of subsection (9). Mike B. Wittenwyler & Jodi E. Jensen, Decoding the Maze: Wisconsin's Campaign Finance Laws, 87 Wis. Law. 22, 25 (Oct. 2014).
D
¶ 290. Subsection (4) of § 11.26 reads:
No individual may make any contribution or contributions to all candidates for state and local offices and to any individuals who or committees which are subject to a registration requirement under s. 11.05, including legislative campaign committees and committees of a political party, to the extent of more than a total of $10,000 in any calendar year.
¶ 291. Statutes limiting total contributions, as opposed to capping contributions to one candidate, were declared unconstitutional in McCutcheon v. Federal Election Commission, 134 S. Ct. 1434 (2014). In short, Wis. Stat. § 11.26(4) is unconstitutional.
¶ 292. Many people have violated subsection (4), often unintentionally, since its enactment. The State has pursued some violators criminally. Cf. State v. Gardner, No. 2011CF137, Washington Cnty., Wis., Cir. Ct. (Apr. 11, 2011).
¶ 293. Important for this review is the fact that the Government Accountability Board insisted on enforcing Wis. Stat. §§ 11.26(4) and 11.26(9) during the recall elections. See MEMORANDUM from Kevin Kennedy to Interested Persons and Committees Involved With Recall Efforts, March 15, 2011. Kennedy's memo also sought to limit the exception to contribution limits for certain recall expenses. Wis. Stat. § 11.26(13m).
*153 E
1 294. The overall effect of Wisconsin's complicated, confusing, outdated, and sometimes unconstitutional campaign finance statutes is to compel candidates to depend increasingly upon expenditures by 501(c)(4) committees that engage in issue advocacy.[15]
¶ 295. The special prosecutor concedes that without "the authorization and consent of [a] candidate committee," an expenditure is independent and constitutionally protected. However, the special prosecutor contends that a committee's "coordination" with a candidate committee eliminates many constitutional protections, and that "there can never be 'coordinated' fundraising between a candidate and a truly independent third party."
¶ 296. In view of the above, the pivotal concern with application of Chapter ll's campaign finance laws is Wis. Stat. § 11.10(4). This subsection reads:
(4) No candidate may establish more than one personal campaign committee. Such committee may have subcommittees provided that all subcommittees have the same treasurer, who shall be the candidate's campaign treasurer. The treasurer shall deposit all funds received in the campaign depository account. Any committee which is organized or acts with the cooperation of or upon consultation with a candidate or agent or authorized committee of a candidate, or which acts in concert with or at the request or suggestion of a candidate or agent or authorized committee of a candidate is deemed a subcommittee of the candidate's personal campaign committee.
*154 (Emphasis added.)
¶ 297. In evaluating the meaning of this provision, we must understand the definition of "committee" in Wis. Stat. § 11.01(4):
"Committee" or "political committee" means any person other than an individual and any combination of 2 or more persons, permanent or temporary, which makes or accepts contributions or makes disbursements, whether or not engaged in activities which are exclusively political, except that a "committee" does not include a political "group" under this chapter.
¶ 298. Put together, these two provisions are vague and absurdly overbroad. Committees include political party committees and legislative campaign committees. Committees include campaign committees of a candidate's fellow party members. Committees include political action committees of every description. The two sections create dire consequences for candidates who exercise the most fundamental political discourse with committees of the candidate's own party and with the candidate's most ardent allies. By fundamental discourse, I mean "cooperation," "consultation," "requests" for support, and "suggestions."
¶ 299. Any person who believes that the statute does not apply to coordination between a candidate and his state political party must understand that the special prosecutor has in his possession 39 months of emails from [- -], obtained by secret search warrant. Anyone who believes that the special prosecutor was not interested in coordination among the Republican candidates in the state senate recalls would be mistaken.
*155 ¶ 300. Turning to non-party committees, how does Wis. Stat. § 11.10(4) apply to a candidate who answers a candidate questionnaire from a committee, which asks the candidate pointed questions on issues, then asks whether the candidate will accept an endorsement and campaign contributions? Surely, a nonjudicial candidate is permitted to ask for financial support.
¶ 301. The "coordination" statute cannot be constitutional as written because it makes the candidate who behaves as a perfectly normal candidate, meeting with organizations and discussing plans, issues, and themes, run the intolerable risk of impairing a committee that does no more than engage in issue advocacy. The committee is neutered if it is made a subcommittee of the candidate's committee because it cannot exceed the candidate's contribution limits. The committee is disqualified because it cannot receive and spend corporate dollars as a subcommittee of a candidate, and it cannot maintain the anonymity of its donors, as permitted by law, if it engages in issue advocacy that helps the candidate.
¶ 302. Under the statute as written, a candidate must surrender his First Amendment freedom to communicate if he is to prevent criminal liability.
¶ 303. A more carefully drafted statute might be able to pass constitutional muster. But not this statute, in the circumstances of this case. And no statute can vest government regulators and special prosecutors with broad discretion to decide whether First Amendment activities violate the law.
¶ 304. In my view, Wis. Stat. § 11.01(16) is unconstitutional if it is not limited to express advocacy; Wis. Stat. § 11.10(4) is unconstitutional as drafted; Wis. Stat. § 11.26(4) is unconstitutional; Wis. Stat. *156 § 11.26(9) is unconstitutional; and Wis. Stat. § 11.26(13m) must be broadly interpreted under the circumstances facing Wisconsin in 2011-2012. As a result, the special prosecutor cannot sustain the theories of prosecutorion that served as the foundation for his John Doe investigation.
¶ 305. For the foregoing reasons, I respectfully concur in the decision to dismiss the John Doe investigation.
f 306. I am authorized to state that Chief Justice PATIENCE DRAKE ROGGENSACK joins Sections IV and V of this opinion, and that Justices ANNETTE KINGSLAND ZIEGLER and MICHAEL J. GABLE-MAN join Section IV of this opinion.
*157 [[Image here]]
*158 ANNETTE KINGSLAND ZIEGLER, J.
¶ 307. 0concurring). During pre-dawn darkness in October 2013, several armed law enforcement officers wearing flak jackets, carrying battering rams, and using bright floodlights executed secret John Doe search warrants in the homes of Wisconsin residents. What was the prosecution searching for? The prosecution was in search of documents and electronic evidence, including personal computers and cell phones, to support alleged violations of Wisconsin's campaign finance law. The warrants sought evidence that had been around for more than four years. The warrants were executed shortly before morning, days after a judge signed them, while it was still dark outside. Law enforcement certainly has, and should have, a great deal of discretion when it comes to how and when a warrant will be executed, but ultimately courts may review the reasonableness of that execution.[1]
¶ 308. Because these searches were executed in pre-dawn darkness, they are essentially what courts and legal commentators refer to as a nighttime search.[2] Because no Wisconsin law specifically addresses the legality of nighttime searches of private homes, under the existing facts of this case, these *159 pre-dawn searches could raise questions as to whether they would pass constitutional muster. I recognize that because no challenge has been made to the execution of the warrants, the record is without explanation as to why the search warrants were executed as they were. I also recognize that the State might have had a legitimate reason for executing the search warrants pre-dawn in paramilitary fashion.
¶ 309. I join the majority opinion in all three cases. I write separately to explain that, even if the search warrants were lawfully issued, the execution of them could be subject to the reasonableness analysis of the Fourth Amendment to the United States Constitution and the Wisconsin Constitution's counterpart.[3] A totality of the circumstances analysis could include consideration of, among other things, the timing of the issuance and execution of the warrants, the manner in which the warrants were executed, whether public or officer safety concerns justified the manner of execution, and what type of evidence was being sought.
I. FUNDAMENTAL PRINCIPLES
¶ 310. The Fourth Amendment "contain[s] two separate clauses, the first protecting the basic right to be free from unreasonable searches and seizures and the second requiring that warrants be particular and supported by probable cause." Payton v. New York, 445 U.S. 573, 584 (1980). The Fourth Amendment's second clause provides that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and *160 particularly describing the place to be searched, and the person or things to be seized." U.S. Const, amend. IV. With respect to the other clause, "[t]he Fourth Amendment to the United States Constitution and Article I, Section 11 of the Wisconsin Constitution protect '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" State v. Robinson, 2010 WI 80, ¶ 24, 327 Wis. 2d 302, 786 N.W.2d 463 (quoting U.S. Const. amend. IV; Wis. Const, art. 1, § ll).[4]
¶ 311. " 'The touchstone of the Fourth Amendment is reasonableness.'" State v. Tullberg, 2014 WI 134, ¶ 29, 359 Wis. 2d 421, 857 N.W.2d 120 (quoting Florida v. Jimeno, 500 U.S. 248, 250 (1991)). " 'The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable.'" Id. (quoting Jimeno, 500 U.S. at 250). "Constitutional reasonableness relates not only to the grounds for a search or seizure but *161 to the circumstances surrounding the search or seizure's execution." State v. Henderson, 2001 WI 97, ¶ 18, 245 Wis. 2d 345, 629 N.W.2d 613 (citing Tennessee v. Garner, 471 U.S. 1, 8 (1985)). "The determination of reasonableness is made by reference to the particular circumstances of each individual case, and balances the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." Id. (internal quotation marks omitted) (citations omitted). In other words, "reasonableness" is "determined by balancing the degree to which a challenged action intrudes on an individual's privacy and the degree to which the action promotes a legitimate government interest." Green v. Butler, 420 F.3d 689, 694 (7th Cir. 2005) (citing United States v. Knights, 534 U.S. 112, 118-19 (2001); Ohio v. Robinette, 519 U.S. 33, 39 (1996)). A court determines whether a search was reasonably executed by considering "the totality of the circumstances." United States v. Banks, 540 U.S. 31, 35-36 (2003).
A. Constitutional Protection of a Home
¶ 312. "The people's protection against unreasonable search and seizure in their 'houses' was drawn from the English common-law maxim, 'A man's home is his castle.'" Minnesota v. Carter, 525 U.S. 83, 94 (1998) (Scalia, J., concurring). "Courts have long extolled the importance of the home, noting that the [Fourth Amendment] was drafted in part to codify 'the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic.'" State v. Scull, 2015 WI 22, ¶ 19, 361 Wis. 2d 288, 862 N.W.2d 562 (quoting Payton, 445 U.S. at 601). The United States Supreme Court has noted *162 that "the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" Payton, 445 U.S. at 585 (quoting United States v. United States District Court, 407 U.S. 297, 313 (1972)). "The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home — a zone that finds its roots in clear and specific constitutional terms: 'The right of the people to be secure in their . .. houses .. . shall not be violated.'" Id. at 589 (ellipses added in Payton). "That language unequivocally establishes the proposition that '[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" Id. at 589-90 (alterations added in Payton) (quoting Silverman v. United States, 365 U.S. 505, 511 (1961)).[5]
*163 B. Nighttime Search of a Home
¶ 313. A nighttime search of a home conflicts with the fact that "[a] home is entitled to special dignity and special sanctity." Holt v. State, 17 Wis. 2d 468, 477, 117 N.W.2d 626 (1962). "Searches of the dwelling house were the special object of this universal condemnation of official intrusion. Nighttime search was the evil in its most obnoxious form." Monroe v. Pape, 365 U.S. 167, 210 (1961) (Frankfurter, J., dissenting in part). "The Supreme Court has consistently recognized that a police search of a residence at night is a greater intrusion upon an individual's privacy interest than an ordinary search." United States v. Gibbons, 607 F.2d 1320, 1326 n.15 (10th Cir. 1979). In Jones v. United States, the Supreme Court stated that it was "difficult to imagine a more severe invasion of privacy than the nighttime intrusion into a private home . . . ." Jones v. United States, 357 U.S. 493, 498 (1958); see also Coolidge v. New Hampshire, 403 U.S. 443, 477 (1971) (describing a "midnight entry" of a home as an "extremely serious intrusion"); United States v. Reed, 572 F.2d 412, 422 (2d Cir. 1978) (citations omitted) ("[T]he Fourth Amendment protects citizens' reasonable expectations of privacy . . . [and] one's reasonable expectation of privacy in the home is entitled to a unique sensitivity from federal courts."); United States v. Martinez-Fuerte, 428 U.S. 543, 561 (1976) (citation omitted) (noting that "the sanctity of private dwellings [ is] ordinarily afforded the most stringent Fourth Amendment protection").[6]
*164 ¶ 314. "At common law, prior to the adoption of the Fourth Amendment, there was a strong aversion to nighttime searches." United States ex rel. Boyance v. Myers, 398 F.2d 896, 897 (3d Cir. 1968) (citations omitted). "This aversion was then and is now primarily focused on intrusions into the home." United States v. Tucker, 313 F.3d 1259, 1263 (10th Cir. 2002) (citing Gibbons, 607 F.2d at 1326). "Nighttime searches were regarded with revulsion [at common law] because of the indignity of rousing people from their beds." Com. v. Grimshaw, 595 N.E.2d 302, 304 (Mass. 1992) (citing Com. v. DiStefano, 495 N.E.2d 328, 332 (Mass. App. Ct. 1986)). "The significance of this aversion of the common law to nighttime searches is underscored by the Supreme Court's reminder that the search and seizure clause is properly 'construed in the light of what was deemed an unreasonable search and seizure when it was adopted.'" Boyance, 398 F.2d at 897 (quoting Carroll v. United States, 267 U.S. 132, 149 (1925)). When a home is invaded during pre-dawn darkness of night, special protections should apply because of the sanctity of a home. This is not to say that a home search can never occur in pre-dawn darkness, but when it does, that timing could be considered as a part of the totality of the circumstances reasonableness analysis of the Fourth Amendment.
f 315. Although Wisconsin does not have a statute directing that a judge must determine whether a nighttime search is justified, 23 states have statutory protections that allow a nighttime search only upon a "special showing and authorization." Wayne R. La- *165 Fave, Search and Seizure § 4.7(b) (5th ed. 2014). Similarly, the Federal Rules of Criminal Procedure implement the essentials of the Fourth Amendment by requiring that a warrant be served "during the daytime, unless the judge, for good cause expressly authorizes execution at another time." Fed. R. Crim. P. 41(e)(2)(A)(ii).[7] The federal rule and these 23 states recognize and codify Fourth Amendment protections against unreasonable nighttime searches and seizures. See United States v. Searp, 586 F.2d 1117, 1124 (6th Cir. 1978) (holding that Federal Rule 41's "night search provisions . . . explicate fundamental purposes of the Fourth Amendment" (internal quotation marks omitted) (citation omitted)).[8]
*166 ¶ 316. When a court is confronted with a challenge to a search that is conducted in the pre-dawn darkness of night, it might consider whether the exigencies of the situation justify the greater intrusiveness of a search at this time. A court could look at factors including, but not limited to, the timing of the issuance and execution of the warrants, the manner in which the warrants were executed, whether public or officer safety concerns justified the manner of execution, and what type of evidence was being sought. Law enforcement is certainly endowed with a great deal of discretion regarding how and when to execute a warrant, but ultimately a court could be called upon to review the reasonableness of that execution under a totality of the circumstances analysis.
¶ 317. Certainly, the necessity of immediate police action may be evident from the facts and circumstances of the situation. Warrant execution in some criminal matters, such as some human trafficking or drug cases, may militate in favor of a warrant being executed at night or in a forceful manner because the criminal activity is likely occurring at night, evidence may likely be lost if law enforcement waits, or dangerous activity is afoot. "It has been held that the danger of destruction or removal of the evidence is sufficient reason for nighttime execution of a search warrant, in part because such circumstances could even constitute exigent circumstances for a search without a warrant." *167 Tucker, 313 F.3d at 1265 (citations omitted). See, e.g., United States v. Howard, 532 F.3d 755, 760-61 (8th Cir. 2008) (upholding a nighttime search because a confidential informant advised police that drug trafficking occurred in the home "during all hours of the night"); Fair v. State, 664 S.E.2d 227, 235 (Ga. 2008) (upholding a 1:15 a.m. search "because the officers knew from experience that the peak time for drug dealers to conduct business was after midnight"). Law enforcement needs a wide berth when determining how and when to execute a warrant, but under the totality of the circumstances, the execution of the warrant must still be reasonable in order to pass constitutional muster.
II. THE TOTALITY OF THE CIRCUMSTANCES
¶ 318. With Fourth Amendment principles in mind, understanding that the record is not complete because no challenge has been made to the warrant execution, the following discussion will nonetheless endeavor to consider the timing of the issuance and execution of the warrants, the manner of execution, whether public or officer safety concerns existed, and what type of evidence was being sought.
A. The Timing of the Issuance and Execution of the Warrants
¶ 319. In the case at issue, Investigator Dean Nickel obtained two secret John Doe warrants from Reserve Judge Barbara Kluka to search the homes of Unnamed Movants Nos. 6 and 7. The warrants were obtained in the course of a secret John Doe investiga *168 tion.[9] Those warrants and their supporting affidavit did not set forth any particular time at which, or manner in which, the warrants would be executed. Unlike many warrants that must be executed at nighttime for fear of the evidence being destroyed or removed from the location or because of public or officer safety reasons, much of this evidence had been sitting on computers and in cyberspace for years.
¶ 320. This was not, as sometimes occurs, a situation where a judge was awoken in the middle of the night to issue a warrant because law enforcement needs to execute it promptly in order to seize the evidence. Reserve Judge Kluka signed the warrants at 11:30 a.m. on Monday, September 30, 2013. However, they were not executed until Thursday, October 3, 2013, at approximately 6:00 a.m.[10] "A search warrant must be executed and returned not more than 5 days *169 after the date of issuance." Wis. Stat. § 968.15(1). These warrants were executed three days after they were issued. "The return of the search warrant shall be made within 48 hours after execution . . . ." Wis. Stat. § 968.17(1). The warrants were returned on October 4, four days after they were issued and one day after they were executed.
¶ 321. The warrants were executed in the predawn darkness. On October 3 civil twilight began in Madison at 6:29 a.m. and sunrise began at 6:57 a.m.[11] For all practical purposes, each of these searches was the equivalent of a nighttime search. Because no challenge to the warrant execution has been made, the record lacks any explanation as to why law enforcement did not execute the warrants any time during the preceding 66.5 hours — or more specifically, the 29.5 daylight hours — between issuance and actual execution.
¶ 322. A nighttime search will often occur shortly after a judge has issued the warrant, as there is some urgency in needing to conduct the search in non-daylight hours. Courts often consider "nighttime" as the time when it is "dark" outside, between sunset and sunrise, between dusk and dawn, or when most people are asleep. See Claudia G. Catalano, Annotation, Propriety of Execution of Search Warrants at Nighttime, 41 A.L.R. 5th 171 (1996). This record, understandably, lacks any indication of why it was reasonable to execute these warrants in this manner, especially since the warrants had been issued three days earlier. The *170 prosecution might have obtained the same evidence in the daylight by waiting a mere hour or two or by executing the warrants in any of the preceding daylight hours. Why did law enforcement execute these secret John Doe warrants days after obtaining them, in the pre-dawn darkness, needing floodlights to illuminate the homes, and with such forceful presence?
¶ 323. While there may be reasons why the warrants were executed when they were, the current state of the record provides no indication that the prosecution "felt some exigency" so as to necessitate the execution of the warrants in the pre-dawn darkness three days after the warrants were issued. See United States v. Berry, 113 F.3d 121, 123 (8th Cir. 1997) (upholding a 12:30 a.m. search for a large quantity of marijuana because the officers "obviously felt some exigency"). See also Harris, 324 F.3d at 606 (upholding a nighttime search performed two hours and 15 minutes after the warrant was issued); Tucker, 313 F.3d at 1261 (same, one hour and 10 minutes); Berry, 113 F.3d at 122 (same, 45 minutes); Boyance, 398 F.2d at 897 (holding that a nighttime search performed 90 minutes after issuance of a warrant was unconstitutional because there was no indication that "the evidence within the house would be removed, hidden or destroyed before morning").
B. The Manner of Execution
¶ 324. Courts have also considered the specific manner in which warrants are executed as part of the totality of the circumstances. "The[se] search warrants were executed at approximately 6:00 a.m. on October 3, 2013, in pre-dawn, armed, paramilitary-style raids in which bright floodlights were used to illuminate the targets' homes." Majority op., ¶ 28. "Deputies seized *171 business papers, computer equipment, phones, and other devices, while their targets were restrained under police supervision and denied the ability to contact their attorneys." Id., ¶ 29. While there may be reasons why the warrants were executed in the manner that they were, the record lacks any such explanation as the execution was not challenged.
¶ 325. Although not critical to my analysis, it is worth noting how some news outlets have described these searches. Had a hearing been held on the manner in which these searches were executed, it is uncertain whether the facts established in such a hearing would be consistent with these news reports or whether there is nonetheless "a legitimate government interest" in the execution of the searches. See Green, 420 F.3d at 694.
¶ 326. Reportedly, about an hour before sunrise, police "surrounded" the homes of Unnamed Movants Nos. 6 and 7 and "hit them with floodlights."[12] "Police didn't draw their guns. They didn't have to. Garish light blinded the groggy targets of the secret probe, startling neighbors. The uniforms, the lights, the early hour got everybody's attention."[13] "One of the targets [said] police threatened to use battering rams to break down the front door, but the targets let them in."[14] Each of these pre-dawn searches of the homes of Unnamed Movants Nos. 6 and 7 reportedly involved at least half a dozen sheriffs deputies and at least one official from the Milwaukee County District Attorney's *172 Office.[15] It has been reported that deputies "[s]hout[ed] [] at the front door"[16] and, once inside, continued "yelling and running, into every room in the house."[17]
¶ 327. Other media outlets described the searches as follows:
The early-morning paramilitary-style raids on citizens' homes were conducted by law-enforcement officers, sometimes wearing bulletproof vests and lugging battering rams, pounding on doors and issuing threats. Spouses were separated as the police seized computers, including those of children still in pajamas. Clothes drawers, including the children's, were ransacked, cell phones were confiscated, and the citizens were told it would be a crime to tell anyone of the raids.[18]
¶ 328. At least one person who was subjected to a pre-dawn search of his or her residence reportedly described it as "a home invasion."[19] The targets of the *173 pre-dawn searches have described these experiences as "terrifying" and "traumatic."[20]
¶ 329. Due to the terms of the John Doe secrecy order itself, the targets were instructed not to tell other people about the searches. The search warrants stated: "This John Doe search warrant is issued subject to a secrecy order. By order of the court, pursuant to a secrecy order that applies to this proceeding, you are hereby commanded and ordered not to disclose to anyone, other than your attorney, the contents of this search warrant and/or the fact that you have received this search warrant. Violation of this secrecy order is punishable as contempt of court." Reportedly, "[m]ultiple targets . . . received verbal instructions from investigators about the secrecy order applying to every member of the household."[21] Despite the language of the secrecy order, some have otherwise averred that the targets "were told not to tell their lawyers, or their friends, or their neighbors."[22]
C. Public and Officer Safety Concerns
¶ 330. As part of the totality of the circumstances, courts have also considered whether safety concerns of the public or the officers justify the timing and the manner of a warrant's execution. Although a paramilitary-style search in the darkness is undoubtedly justified in some circumstances, the current state of this record provides no indication that Unnamed Movants Nos. 6 and 7 "posed an immediate threat to *174 the safety of the officers or others," were "actively resisting arrest or attempting to evade arrest by flight," or were "themselves violent or dangerous." See Estate of Smith v. Marasco, 430 F.3d 140, 150 (3d Cir. 2005) (holding that these facts are important for determining whether a SWAT-type search was reasonable). In the present case, executing the warrants in paramilitary fashion during pre-dawn darkness arguably might have actually increased the risk of injury to the public or the officers. See Bravo v. City of Santa Maria, 665 F.3d 1076, 1086 (9th Cir. 2011) ("SWAT officers' nighttime searches . . . both constitute much greater intrusions on one's privacy than ordinary daytime searches and carry a much higher risk of injury to persons and property.").
¶ 331. A "nighttime police intrusion pose[s] a great threat to privacy, violate [s] the sanctity of home, and endanger[s] the police and slumbering citizens." Grimshaw, 595 N.E.2d at 304 (citing 2 W.R. LaFave, Search and Seizure § 4.7(b), at 266 (2d ed. 1987)). In the present case, whether any public or officer safety concern justified the pre-dawn searches is unknown because the execution was not challenged. Cf. United States v. Colonna, 360 F.3d 1169, 1176 (10th Cir. 2004) (upholding a nighttime search because of the defendant's "prior extensive involvement with law enforcement, the expressed fear of a concerned citizen that [the defendant] would retaliate violently, and the presence of children in the vicinity" during the daytime).
D. The Evidence
¶ 332. I turn now to the nature of the evidence being sought. This case is not one where the alleged crime is occurring at night during the search. This is not a drug or human trafficking investigation where it *175 is apparent that the evidence of the crime may no longer be present at the search location if the warrants are not executed promptly. The circumstances of this case do not plainly suggest that waiting until daybreak would have posed a safety risk to the public or officers.
¶ 333. These pre-dawn searches sought, among other things, electronic evidence, including e-mails and communications stored on cell phones and personal computers.[23] The search warrants sought information from March 1, 2009, to September 30, 2013, the date that the warrants were issued. This evidence, which seemingly had been around for years and likely otherwise exists in cyberspace, did not appear to be "volatile" and no reason is readily apparent to explain why executing the warrants in a more traditional manner, by far less forceful means, would pose any "risk of personal injuries and property damage." See Tucker, 313 F.3d at 1266 (upholding a nighttime search because "there was not just risk of destruction of the evidence but also risk of personal injuries and property damage due to the volatile nature of the chemicals and the process of methamphetamine manufacture").
¶ 334. While not jugular to the totality of the circumstances analysis, it seems that this electronic evidence was not in "danger of destruction or removal" from the homes before morning. See id. at 1265. The process of erasing a file on a personal computer "is time *176 consuming and does not wipe out all data."[24] A cell phone's files may likewise be difficult to erase. "Smart-phone forensics experts can retrieve just about anything from any phone," "whether or not a user deleted it from their phone."[25] In fact, the affidavit in support of the warrants to search the homes of Unnamed Movants Nos. 6 and 7 seemed to recognize that the evidence was not at risk of being destroyed, even if deleted. The affidavit itself declared that "computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet." (Emphases added.)
¶ 335. Even if the computers and cell phones had been totally destroyed, investigators still could have sought to obtain Unnamed Movants Nos. 6's and 7's e-mail messages from third parties, such as Internet service providers or e-mail service providers.[26] Wisconsin law expressly authorizes subpoenas and search warrants to be issued to such third parties. See Wis. Stat. § 968.375. Milwaukee County prosecutors have used these techniques in recent prosecutions of a somewhat similar nature. See State v. Rindfleisch, 2014 WI App 121, 359 Wis. 2d 147, 857 N.W.2d 456 *177 (holding that search warrants, which required Google Inc. and Yahoo Inc. to provide evidence from the defendant's personal e-mail messages, were sufficiently particular).
¶ 336. In fact, previously during this very John Doe investigation, the State did obtain Unnamed Movants Nos. 6's and 7's e-mails from their e-mail service providers. Specifically, on September 5, 2012, the same day that Reserve Judge Kluka commenced this John Doe investigation, she signed a warrant requiring Yahoo Inc. to supply information from Unnamed Movant No. 6's Yahoo e-mail account. Also on September 5 Reserve Judge Kluka signed a similar warrant requiring Charter Communications Inc. to provide information from Unnamed Movant No. 7's Charter e-mail account. Each of these warrants required the production of, inter alia, "[t]he contents of all communications stored in the E-mail accounts for the subscriber(s). . ., including all emails stored in the account, whether sent from or received in the account, including any 'chat or instant messaging,' as well as e-mails held in a 'Deleted' status," from April 1, 2009, to July 1, 2012. Yahoo and Charter complied with the warrants within six weeks and two weeks, respectively. Thus, at least some of the evidence that the prosecution hoped to obtain by searching the homes of Unnamed Movants Nos. 6 and 7 in October 2013 could very well have been duplicative of the e-mail evidence that Yahoo and Charter produced pursuant to the September 2012 search warrants.
¶ 337. While not required, another avenue of obtaining evidence may have existed through subpoenas duces tecum, which could have been served on Unnamed Movants Nos. 6 and 7 as an alternative to the pre-dawn, paramilitary-style searches of their *178 homes. See Wis. Stat. § 968.135. In fact, such subpoenas were issued on other Unnamed Movants. Specifically, on the same day that Reserve Judge Kluka issued the warrants to search the homes of Unnamed Movants Nos. 6 and 7, she issued subpoenas duces tecum to the other six Unnamed Movants. These subpoenas duces tecum required the production of, inter alia, information regarding Unnamed Movants Nos. 6 and 7. Although law enforcement is not required to obtain information by subpoena instead of a warrant, the type of evidence being sought and the ways in which it may be obtained could possibly be of some significance in the totality of the circumstances test of reasonableness.
¶ 338. Milwaukee County Sheriff David A. Clarke, Jr. has been vocal in explaining his belief that it was unreasonable and unnecessary to execute these pre-dawn searches in the manner in which they were executed. He said, "[a] simple knock on the door by a couple of suit wearing investigators with . . . one uniform back-up [officer] to verify who they were was all that was necessary to execute this search warrant."[27]
III. CONCLUSION
¶ 339. "Constitutional reasonableness relates not only to the grounds for a search or seizure but to the circumstances surrounding the search or seizure's execution." Henderson, 245 Wis. 2d 345, ¶ 18 (citing *179 Garner, 471 U.S. at 8).[28] "The determination of reasonableness is made by reference to the particular circumstances of each individual case, and balances the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." Id. (internal quotation marks omitted) (citations omitted). "The idea of the police unnecessarily forcing their way into the homes in the middle of the night. . . rousing the residents out of their beds, and forcing them to stand by in indignity in their night clothes while the police rummage through their belongings does indeed smack of a 'police state lacking in the respect for . . . the right of privacy dictated by the U.S. Constitution.'" Gooding v. United States, 416 U.S. 430, 462 (1974) (Marshall, J., dissenting) (quoting S. Rep. No. 91 — 538, p. 12 (1969)).
¶ 340. I join the majority opinion in all three cases. I write separately to explain that even if the search warrants were lawfully issued, the execution of them could be subject to the reasonableness analysis of the Fourth Amendment to the United States Constitution and the Wisconsin Constitution's counterpart. A totality of the circumstances analysis could include consideration of, among other things, the timing of the issuance and execution of the warrants, the manner in *180 which the warrants were executed, whether public or officer safety concerns justified the manner of execution, and what type of evidence was being sought.
¶ 341. For the foregoing reasons, I respectfully concur.

 State ex rel. Schmitz v. Peterson, 2014AP417—W through 2014AP421—W; State ex rel. Three Unnamed Petitioners v. Peterson, 2013AP2504-W through 2013AP2508-W.

 State ex rel. Two Unnamed Petitioners v. Peterson, No. 2014AP296-OA.

 The first Wisconsin legislator to be successfully recalled was Senator George Petak (R-Racine), who lost a recall election on June 4, 1996. In 1995 Senator Petak voted for a bill to authorize financing for a new baseball stadium for the Milwaukee Brewers. Senator Petak's recall shifted control of the Senate to the Democratic Party.

 See also Wis. Stat. §§ 978.03(3), 978.043.

 1989 Wis. Act 117, § 5.

 It is not clear to the writer whether a court from one county is required to make an appointment if a district attorney, deputy district attorney, or assistant district attorney *122 from another county, or an assistant attorney general, responds to a request for assistance from the court or from the district attorney in the court's home county. Wis. Stat. § 978.045(lg). A district attorney may, on his own, appoint an attorney to serve as a special prosecutor "without state compensation." Wis. Stat. § 978.045(3)(a). A district attorney from a large county also may appoint "temporary counsel as may be authorized by the department of administration." Wis. Stat. § 978.03(3). Judicial appointment of a special counsel in these situations would appear unnecessary but fully authorized if the appointment is consistent with subsection (lr).

 According to one study, Wisconsin employed only two-thirds of the number of prosecutors needed in 2012. See Eric Litke, Wisconsin Needs 215 More Prosecutors, Study Says, Green Bay Press-Gazette (Apr. 14, 2013), available at http://archive.greenbaypressgazette.com/article/20130413/GP G0198/304130026/Wisconsin-needs-215-more-prosecutorsstudy-says. During the 2011-13 budget cycle, 42 of the 71 district attorneys in the state requested funding for additional positions; none of the requests was granted. Id.

 The Supreme Court has incorporated the Fourth Amendment into the Fourteenth Amendment so that it applies to the states. See Ker v. California, 374 U.S. 23, 33 (1963).

 Cf. United States v. Warshak, 631 F.3d 266, 288 (6th Cir. 2010) ("[A] subscriber enjoys a reasonable expectation of privacy in the contents of emails 'that are stored with, or sent or received through, a commercial ISP.'") (citation omitted).

 See Kristen Purcell, Search and Email Still Top the List of Most Popular Online Activities, Pew Research Center Internet Project (Aug. 9, 2011), http://www.pewintemet.org/2011/ 08/09/search-and-email-still-top-the-list-of-most-popular-online-activities.

 Wisconsin Stat. § 968.28 limits the interception of electronic communications without a court order under Wis. Stat. *140 § 968.30. Court orders for interception may be obtained only for specified offenses ranging from homicide, felony murder, and kidnapping to soliciting a child for prostitution, Wis. Stat. § 968.28, and such orders may not exceed 30 days in duration without specific judicial extension. Wis. Stat. § 968.30(5). These statutory limitations and protections for interception do not appear to apply when search warrants are issued for past electronic communications that must be retrieved from electronic storage.

 On Memorial Day weekend in 1972, an intelligence gathering team from Richard Nixon's Committee to ReElect the President broke into the Democratic National Committee's (DNC) headquarters at the Watergate complex in Washington, D.C. The operatives wiretapped the telephones of the chairman of the DNC and the executive director of the Association of State Democratic Chairmen. A member of the team also photographed certain documents. One phone tap did not work and the other yielded little information. When the burglars returned for a second visit, they were apprehended. Cf. Keith W. Olsen, Watergate: The Presidential Scandal That Shook America (2003). President Nixon was forced to resign, in part for attempting to cover up a burglary to gain political intelligence that he did not personally authorize.

 "SLAPP is an acronym for Strategic Lawsuit Against Public Participation. Vultaggio v. Yasko, 215 Wis. 2d 326, 359, 572 N.W.2d 450 (1998) (Bradley, J., dissenting); Briggs v. Eden Council, 969 P.2d 564, 565 n.1 (Cal. 1999)." Lassa v. Rongstad, 2006 WI 105, ¶ 108 n.1, 294 Wis. 2d 187, 718 N.W.2d 673 (Prosser, J., dissenting). See also id., ¶ 161 n.10.

 The precise scope of a permissible secrecy order will... vary from proceeding to proceeding. However, as we observed in [State v. O'Connor, 77 Wis. 2d 261, 252 *143 N.W.2d 671 (1977)], "[s]ecrecy of John Doe proceedings and the records thereof is not maintained for its own sake." Id. at 283. The policy underlying secrecy is directed to promoting the effectiveness of the investigation. Id. at 286. Therefore, any secrecy order "should be drawn as narrowly as is reasonably commensurate with its purposes."
State ex rel. Unnamed Person No. 1 v. State, 2003 WI 30, ¶ 61, 260 Wis. 2d 653, 688-89, 660 N.W.2d 260.

 This was especially evident in the 2011 Wisconsin Supreme Court election in which both candidates were bound by minimal contribution limits and tight spending limits because they accepted public funding.

 "' [I]t is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by the warrant — subject of course to the general Fourth Amendment protection against unreasonable searches and seizures.'" State v. Sveum, 2010 WI 92, ¶ 53, 328 Wis. 2d 369, 787 N.W.2d 317 (alteration added in Sveum) (quoting Dalia v. United States, 441 U.S. 238, 257 (1979)) (internal quotation marks omitted).

 For a more comprehensive discussion of the law regarding nighttime searches, see Claudia G. Catalano, Annotation, Propriety of Execution of Search Warrants at Nighttime, 41 A.L.R. 5th 171 (1996).

 "Even if a court determines that a search warrant is constitutionally valid, the manner in which the warrant was executed remains subject to judicial review." Sveum, 328 Wis. 2d 369, ¶ 53 (citing State v. Andrews, 201 Wis. 2d 383, 390, 549 N.W.2d 210 (1996)).

 The Fourth Amendment to the United States Constitution provides in full:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
Article I, Section 11 of the Wisconsin Constitution states:
The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

 The Supreme Court has noted that a search of a cell phone or personal computer could carry some of the implications of a home search. The Court noted that "many [cell phones] are in fact minicomputers that also happen to have the capacity to be used as a telephone." Riley v. California, 573 U.S. _, 134 S. Ct. 2473, 2489 (2014). Given the "storage capacity of cell phones," "a cell phone search would typically expose to the government far more than the most exhaustive search of a house: A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form . . . ." Id. at 2489, 2491. In fact, some courts have required warrants to be more particular than just seeking all e-mails. See In re Applications for Search Warrants for Info. Associated with Target Email Accounts /Skype Accounts, No. 13-MJ-8163^IPO, 2013 WL 4647554, at *8 (D. Kan. Aug. 27, 2013) (holding that "the warrants proposed by the government violate the Fourth Amendment" because they did not particularly describe the e-mails to be searched).

 "Because the fourth amendment's proscriptions against unreasonable searches are virtually identical to those in art. I, sec. 11 of the Wisconsin Constitution, state law of search and seizure conforms to that developed under federal law." State v. *164 Long, 163 Wis. 2d 261, 266, 471 N.W.2d 248 (Ct. App. 1991) (citing State v. Reed, 156 Wis. 2d 546, 551, 457 N.W.2d 494 (Ct. App. 1990)). See also State v. Tullberg, 2014 WI 134, ¶ 29 n.17, 359 Wis. 2d 421, 857 N.W.2d 120.

 The Federal Rules of Criminal Procedure require special justification for a nighttime search. Fed. R. Crim. P. 41(e)(2)(A)(ii). However," '[d]aytime' means the hours between 6:00 a.m. and 10:00 p.m. according to local time." Fed. R. Crim. P. 41(a)(2)(B). Although this Federal Rule may have been technically complied with because the searches at issue might have begun a few minutes after 6:00 a.m., technical compliance with the Federal Rule does not automatically render these searches immune from constitutional scrutiny in this state court matter. While federal rules attempt to provide for consistency from state to state, courts have often taken a practical approach when defining "nighttime" for Fourth Amendment purposes. See Claudia G. Catalano, Annotation, Propriety of Execution of Search Warrants at Nighttime, 41 A.L.R. 5th 171 (1996). See also United States v. Palmer, 3 F.3d 300, 303 (9th Cir. 1993) (holding that Federal Rule of Criminal Procedure 41 did not apply because "[t]he investigation in this case was initiated and controlled by the local law enforcement officials involved"). In the case at issue, although the Special Prosecutor is a former Federal Prosecutor, his investigation of this matter was not in the federal system. This investigation was initiated and controlled by local law enforcement officials.

 A violation of these rules may result in suppression of the evidence if the violation rises to constitutional proportion. See, *166 e.g., United States v. Bieri, 21 F.3d 811, 816 (8th Cir. 1994) (citation omitted) ("We apply the exclusionary rule to violations of [the nighttime search provision of] Rule 41 only if a defendant is prejudiced or reckless disregard of proper procedure is evident."); see also United States v. Berry, 113 F.3d 121, 123 (8th Cir. 1997) (noting that a violation of Federal Rule of Criminal Procedure 41's nighttime search provision can be "of constitutional magnitude").

 A John Doe proceeding, known as "John Doe I," was commenced in the spring of 2010 "for the purpose of investigating the alleged misuse of public resources in the Milwaukee County Executive's office." Majority op., f 14. The John Doe I investigation "triggered a second John Doe proceeding (John Doe II), the investigation at issue here." Id., ¶ 15. On August 10, 2012, Milwaukee County Assistant District Attorney David Robles filed a petition for the commencement of John Doe II in the Milwaukee County circuit court. Id. On September 5, 2012, "Reserve Judge Kluka authorized the commencement of the John Doe [II] proceeding and also granted the requested secrecy order." Id., ¶ 17.

 The return on the warrant to search Unnamed Movant No. 6's house, in a box titled "Recovery Date," reads "10/03/2013 06:15:00." Similarly, the return on the warrant to search Unnamed Movant No. 7's house, in a box titled "Recovery Date," reads "10/03/2013 6:03:13." The record does not indicate to what these times correspond. Media reports indicate that the searches lasted two and a half hours. See, e.g., Buttle, infra note 12. The record is unclear.

 See U.S. Naval Observatory: Astronomical Applications Department, Sun and Moon Data for One Day, available at http://aa.usno.navy.mil/rstt/onedaytable?form=l&ID=AA& year=2013&month=10&day=3&state=WI&place=Madison (last visited June 13, 2015).

 M. D. Kittle, The day John Doe Rushed Through the Door, WisconsinWatchdog.org, Oct. 3, 2014, available at http://watchdog.org/174987/john-doe-raids-eric-okeefe.

 Id.

Id.

 The record is not clear as to why at least one representative from the Milwaukee County District Attorney's Office was on scene for the searches. The record is also unclear as to whether it is typical protocol for a Milwaukee County District Attorney's Office representative to be present when a search warrant is executed.

 Rich Lowry, Politicized Prosecution Run Amok in Wisconsin, National Review, Apr. 21, 2015, available at http://www.nationalreview.com/article/417207/politicized -prosecution-run-amok-wisconsin-rich-lowry.

 David French, Wisconsin's Shame: "I Thought It Was a Home Invasion", National Review, Apr. 20, 2015, available at http://www.nationalreview.com/article/417155/wisconsinsshame-i-thought-it-was-home-invasion-david-french.

 George Will, Done in by John Doe, National Review, Oct. 25, 2014, available at http://www.nationalreview.com/ article/391130/done-john-doe-george-will.

 French, supra note 17.

 Id.

 M. D. Kittle, Warrants Command John Doe Targets to Remain Silent, WisconsinWatchdog.org, May 14, 2015, available at http://watchdog.org/218761/john-doe-warrants-raids/.

 Lowry, supra note 16 (emphasis added).

 From Unnamed Movant No. 6's home, law enforcement officers seized tax records, check stubs, invoices, a binder containing documents, a box of documents, an external hard drive, and a laptop computer. From Unnamed Movant No. 7's home, officers seized three cell phones, three external hard drives, two computer towers, two laptop computers, two Apple iPods, a document folder, three compact discs, a thumb drive, a voice recorder, bank stubs, personal pocket calendars, and financial records.

 Christine Galves & Fred Galves, Ensuring the Admissibility of Electronic Forensic Evidence and Enhancing Its Probative Value at Trial, 19 Criminal Justice Magazine 1 (Spring 2004), available at http://www.americanbar.org/ publications /criminal justice_magazine_home/crimjust_cjmag_19 _l_electronic.html.

 David Goldman, How Police Can Find Your Deleted Text Messages, CNN Money, May 22, 2013, available at http:// money.cnn.com/2013/05/22/technology/mobile/smartphoneforensics/.

 Galves, supra note 24.

 David French, Wisconsin's Shame: Sheriff Clarke Weighs In, National Review, Apr. 23, 2015, available at http ://www.nationalreview. com/corner/417406/wisconsinsshame-sheriff-clarke-weighs-david-french.

 See State v. Henderson, 2001 WI 97, ¶ 3, 245 Wis. 2d 345, 629 N.W.2d 613 (recognizing that the Fourth Amendment reasonableness inquiry considers whether officers knocked and announced their presence before entry); see also United States v. Gibbons, 607 F.2d 1320, 1326 (10th Cir. 1979) (holding that "a nighttime intrusion is one element in considering the reasonableness of the search"); State v. Jackson, 742 N.W.2d 163, 177 (Minn. 2007) (holding that "the search of a home at night is a factor to be considered in determining whether a search is reasonable under the Fourth Amendment").